**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GEORGE K. YOUNG, JR.,<br>*Plaintiff-Appellant,*<br><br>v.<br><br>STATE OF HAWAII; NEIL ABERCROMBIE, in his capacity as Governor of the State of Hawaii; DAVID MARK LOUIE I, Esquire, in his capacity as State Attorney General; COUNTY OF HAWAII, as a sub-agency of the State of Hawaii; WILLIAM P. KENOI, in his capacity as Mayor of the County of Hawaii; HILO COUNTY POLICE DEPARTMENT, as a sub-agency of the County of Hawaii; HARRY S. KUBOJIRI, in his capacity as Chief of Police; JOHN DOES, 1–25; JANE DOES, 1–25; DOE CORPORATIONS, 1–5; DOE ENTITIES, 1–5,<br>*Defendants-Appellees.* | No. 12-17808<br><br>D.C. No.<br>1:12-cv-00336-HG-BMK<br><br>OPINION |

Appeal from the United States District Court
for the District of Hawaii
Helen W. Gillmor, Senior District Judge, Presiding

2    Young v. State of Hawaii

Argued and Submitted February 12, 2018
Honolulu, Hawaii

Filed July 24, 2018

Before:  Diarmuid F. O'Scannlain, Richard R. Clifton,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge O'Scannlain;
Dissent by Judge Clifton

## SUMMARY[*]

## Civil Rights

The panel reversed the district court's dismissal of claims brought against the County of Hawaii, dismissed plaintiff's appeal as to the State of Hawaii, and remanded, in plaintiff's 42 U.S.C. § 1983 action alleging that the denial of his application for a handgun license violated his Second Amendment right to carry a loaded firearm in public for self-defense.

The County of Hawaii's Chief of Police denied plaintiff's application to carry a handgun because he failed to satisfy Hawaii's licensing requirements, as set forth in section 134-9 of the Hawaii Revised Statutes. Section 134-9 acts as a limited exception to the State of Hawaii's "Place[s] to Keep" statutes, which generally require that gun owners keep their firearms at their "place of business, residence, or sojourn." H.R.S. §§ 134-23, 134-24, 134-25. The exception allows citizens to obtain a license to carry a loaded handgun in public, either concealed or openly, under certain circumstances. Plaintiff alleged that the County violated the Second Amendment by enforcing against him the State's limitations in section 134-9 on the open carry of firearms to those "engaged in the protection of life and property" and on the concealed carry of firearms to those who can demonstrate an "exceptional case."

The panel acknowledged that while the concealed carry of firearms categorically falls outside Second Amendment

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

protection, *see Peruta v. County of San Diego*, 824 F.3d 919, 939 (2016) (en banc), it was satisfied that the Second Amendment encompasses a right to carry a firearm openly in public for self-defense. Analyzing the text of the Second Amendment and reviewing the relevant history, including founding-era treatises and nineteenth century case law, the panel stated that it was unpersuaded by the County's and the State's argument that the Second Amendment only has force within the home. The panel stated that once identified as an individual right focused on self-defense, the right to bear arms must guarantee *some* right to self-defense in public. The panel held that because Hawaii law restricted plaintiff in exercising the right to carry a firearm openly, it burdened conduct protected by the Second Amendment.

In determining the appropriate level of scrutiny to apply to section 134-9, the panel first held that the right to carry a firearm openly for self-defense falls within the core of the Second Amendment. The panel stated that restricting open carry to those whose job entails protecting life or property necessarily restricts open carry to a small and insulated subset of law-abiding citizens. The panel reasoned that the typical, law-abiding citizen in the State of Hawaii was entirely foreclosed from exercising the core Second Amendment right to bear arms for self-defense. The panel concluded that Hawaii's limitation on the open carry of firearms to those "engaged in the protection of life and property" violated the core of the Second Amendment and was void under any level of scrutiny.

Dissenting, Judge Clifton stated the majority opinion disregarded the fact that states and territories in a variety of regions have long allowed for extensive regulations of and limitations on the public carry of firearms. Judge Clifton wrote that such regulations are presumptively lawful under

*District of Columbia v. Heller*, 554 U.S. 570 (2008), and do not undercut the core of the Second Amendment. In addition, Judge Clifton stated that the majority opinion misconceived the intermediate scrutiny test, assumed without support in the record that Hawaii's statute operates as a complete ban, and substituted its own judgment about the efficacy of less restrictive regulatory schemes.

## COUNSEL

Alan A. Beck (argued), Law Offices of Alan Beck, San Diego, California; Stephen D. Stamboulieh, Stamboulieh Law PLL, Madison, Mississippi; for Plaintiff-Appellant.

D. Kaena Horowitz (argued), County of Hawaii Deputy Corporation Counsel; Laureen L. Martin, County of Hawaii Assistant Corporation Counsel; Office of the Corporation Counsel, Hilo, Hawaii; for Defendants-Appellees County of Hawaii, William P. Kenoi, and Harry S. Kubojiri.

Kimberly Tsumoto Guidry, First Deputy Solicitor General; Robert Tadao Nakatsuji, Deputy Solicitor General; Department of the Attorney General, Honolulu, Hawaii; for Defendant-Appellee and Amicus Curiae State of Hawaii.

No appearance for Defendants-Appellees Neil Abercrombie and David Mark Louie I.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the Second Amendment encompasses the right of a responsible law-abiding citizen to carry a firearm openly for self-defense outside of the home.

### I

### A

George Young wishes to carry a firearm publicly for personal self-defense in the State of Hawaii. He twice in 2011 applied for a license to carry a handgun, either concealed or openly. His application was denied each time by the County of Hawaii's Chief of Police, Harry Kubojiri, because Young failed to satisfy the requirements set forth in section 134-9 of the Hawaii Revised Statutes ("H.R.S.").

Section 134-9 acts as a limited exception to the State of Hawaii's "Place[s] to Keep" statutes, which generally require that gun owners keep their firearms at their "place of business, residence, or sojourn." H.R.S. §§ 134-23, 134-24, 134-25. The exception allows citizens to obtain a license to carry a loaded handgun in public, either concealed or openly, under certain circumstances. H.R.S. § 134-9. Respecting concealed carry, section 134-9 provides that "[i]n an exceptional case, when an applicant shows reason to fear injury to the applicant's person or property, the chief of police . . . may grant a license to an applicant . . . to carry a pistol or revolver and ammunition therefor concealed on the person." The chief of police may, under section 134-9, grant a license for the open carry of a loaded handgun only "[w]here the urgency or the need has been sufficiently

indicated" and the applicant "is engaged in the protection of life and property." The County of Hawaii has promulgated regulations to clarify that open carry is proper only when the license-holder is "in the actual performance of his duties or within the area of his assignment." Police Dep't of Cty. of Haw., *Rules and Regulations Governing the Issuance of Licenses* 10 (Oct. 22, 1997).

Absent a license under section 134-9, a person may only transport an unloaded firearm, in an enclosed container, to and from a place of repair, a target range, a licensed dealer, a firearms exhibit, a hunting ground, or a police station, H.R.S. §§ 134-23, 134-24, 134-25, 134-26, 134-27, and may only use those firearms while "actually engaged" in hunting or target shooting, H.R.S. § 134-5.

### B

On June 12, 2012, Young filed this suit *pro se* under 42 U.S.C. § 1983 against the State of Hawaii, its then-Governor, Neil Abercrombie, and its then-Attorney General, David Louie (collectively "the State"), as well as the County of Hawaii, its then-Mayor, William Kenoi, the Hilo County Police Department, and its then-Chief of Police, Harry Kubojiri (collectively "the County"). Primarily alleging that denying his application for a handgun license violates his Second Amendment right to carry a loaded firearm in public for self-defense, Young requested, among other things, injunctive and declaratory relief from the enforcement of section 134-9's licensing requirements.

The State filed a motion to dismiss Young's claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and the County filed a motion to dismiss the claims under Rule 12(b)(6). The district court granted both. As for the State of Hawaii, the district court found Young's action to be barred

by sovereign immunity. Young's action against the State officials—while not barred by sovereign immunity under *Ex Parte Young*, 209 U.S. 123 (1908)—was dismissed because the district court found their general oversight of the enforcement of Hawaii's laws "insufficient to establish a nexus between [such] officials and the alleged violation of [Young's] civil rights."

Dismissing Young's action against the County on the merits, the district court found that section 134-9 "does not implicate activity protected by the Second Amendment," because that Amendment "establishes only a narrow individual right to keep an operable handgun at home for self-defense." In the alternative, the district court indicated that it would uphold section 134-9's open and concealed carry limitations under intermediate scrutiny. As the court reasoned, the State's "substantial interest in safeguarding the public from the inherent dangers of firearms" was reasonably furthered by policies that "enable[] officials to effectively differentiate between individuals who need to carry a gun for self-defense and those who do not."

Young timely appealed.[1]

---

[1] Young filed a notice of appeal with respect to the dismissal of his claims against *both* the State and County, but on appeal he makes no arguments to contest the district court's reasons for dismissing his claims against the State. Believing itself no longer a party to the case, the State has neither filed a response brief nor sought to participate in oral argument. We thus do not review the district court's judgment in its favor and Young's appeal against the State accordingly must be dismissed.

The State has, however, filed several briefs as amicus curiae. At oral argument, the County explicitly endorsed the arguments of the State

## II

## A

Young's argument is straightforward: he asserts that the County has violated the Second Amendment by enforcing against him the State's limitations in section 134-9 on the open carry of firearms to those "engaged in the protection of life and property"[2] and on the concealed carry of firearms to those who can demonstrate an "exceptional case."[3]

---

made as amicus curiae. Thus, when we refer to arguments made by the State they are to be found in its amicus briefs as adopted by the County.

[2] Young does not address the additional limitation in section 134-9 providing that an open carry license may only be granted "[w]here the urgency or the need has been sufficiently indicated." Nor could we evaluate such a requirement at the motion to dismiss stage, absent evidence showing the stringency of the requirement. Thus, we do not decide whether such requirement violates the Second Amendment.

[3] In the district court, Young also argued that section 134-9 violates the Ninth Amendment, the Privileges or Immunities Clause, the Bill of Attainder Clause, and the Contracts Clause. Young has abandoned such claims on appeal.

But Young does raise several new arguments on appeal. He argues that the State of Hawaii's prohibitions on the possession of electric guns (H.R.S. § 134-16), switchblades (H.R.S. § 134-52), and butterfly knives (H.R.S. § 134-53) violate the Second Amendment. He also argues that the prohibition on carrying rifles and shotguns publicly, arising out of section 134-24, violates the Second Amendment. Because Young failed properly to raise these arguments before the district court, we deem such arguments forfeited. *See United States v. Greger*, 716 F.2d 1275, 1277 (9th Cir. 1983).

1

The County and the State respond that Young's claim is foreclosed by our en banc decision in *Peruta v. County of San Diego* (*Peruta II*), 824 F.3d 919 (2016) (en banc), which overturned a three-judge panel's decision striking down a concealed carry licensing regime, *see Peruta v. County of San Diego* (*Peruta I*), 742 F.3d 1144 (9th Cir. 2014).

In *Peruta II*, we considered a challenge to San Diego's limitations on the concealed carry of handguns outside of the home. 824 F.3d at 924. California law generally prohibits carrying firearms in public, whether concealed or openly. *See* Cal. Penal Code §§ 25400, 25850, 26350. But San Diego County leaves open the opportunity to carry a concealed firearm upon the demonstration of "good cause." *See Peruta II*, 824 F.3d at 926. Rejecting Peruta's challenge, our en banc court held that "the Second Amendment right to keep and bear arms does not include, *in any degree*, the right of a member of the general public to carry concealed firearms in public." *Id.* at 939 (emphasis added). But, as even the dissent acknowledges, our court explicitly left unresolved the question of whether the Second Amendment encompasses a right to open carry. *See id.* ("There may or may not be a Second Amendment right for a member of the general public to carry a firearm openly in public. The Supreme Court has not answered that question, and we do not answer it here."). Young's claim therefore picks up where Peruta's left off and presents an issue of first impression for this circuit: whether the Second Amendment encompasses a right to carry firearms openly in public for self-defense.

2

Our interpretation of the Second Amendment is guided by the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). In *Heller*, the Court invalidated a District of Columbia ban on handgun possession in the home, holding that the Second Amendment guarantees an individual right to keep a handgun in one's home for self-defense, and rejecting a collective view of the right. *See* 554 U.S. at 635. Because the District of Columbia law had completely banned "the quintessential self-defense weapon" within the home, the Court saw no need to clarify further the scope of the right or the level of scrutiny it demands. *See id.* at 629. "Under any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights," such a severe deprivation must fail. *Id.* at 628–29.

In *McDonald*, the Court incorporated the Second Amendment against the States through the Fourteenth Amendment, invalidating a Chicago law that effectively banned handgun possession by residents of the city. 561 U.S. at 750. In determining whether the pre-existing right codified by the Second Amendment was "fundamental to *our* scheme of ordered liberty," the Court stressed the centrality of self-defense: "Self-defense is a basic right, recognized by many legal systems from ancient times to the present day . . . ." *Id.* at 767. Consequently, the Court held it "clear that this right is 'deeply rooted in this Nation's history and tradition,'" thus binding the States alongside the federal government. *Id.* at 768 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)); *see also id.* at 805–06 (Thomas, J., concurring in part and concurring in the judgment) (agreeing that the Second Amendment is "fully applicable to

the States," but via the Fourteenth Amendment's Privileges or Immunities Clause).

As was the case in *Peruta II*, we find ourselves navigating waters uncharted by *Heller* and *McDonald*: the degree to which the Second Amendment protects, or does not protect, the carrying of firearms outside of the home.

B

Our circuit, like others, employs a two-step approach to Second Amendment challenges. *See Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014); *see also United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). We first ask "whether the challenged law burdens conduct protected by the Second Amendment." *Jackson*, 746 F.3d at 960 (quoting *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013)). If so, we must "apply an appropriate level of scrutiny." *Id*. And because *Heller* makes clear that evaluating restrictions of Second Amendment rights under rational basis review is inappropriate, *see* 554 U.S. at 628 n.27, any means-end scrutiny applied must be some form of heightened scrutiny, such as intermediate or strict scrutiny. Of course, we remain ever mindful not to treat the Second Amendment any differently from other individual constitutional rights. It is not "a second-class right," *McDonald*, 561 U.S. at 780, nor a "constitutional orphan," *Silvester v. Becerra*, No. 17-342, 2018 WL 943032, at *8 (U.S. Feb. 20, 2018) (Thomas, J., dissenting from denial of certiorari).

*Heller* and *McDonald* set the goalposts for our inquiry, which requires determining the scope of the Second Amendment with respect to public carry. We must discern the scope of the Amendment not as it appears to us now, but

"with the scope [it was] understood to have when the people adopted [it]." *Heller*, 554 U.S. at 634–35. Our lodestars are "text and history," *id.* at 595, because they bear most strongly on what the right was understood to mean, at the time of enactment, to the public. Because "words and phrases were used in their normal and ordinary as distinguished from technical meaning," *id.* at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)), our approach is not just a textual one, but also a contextual one. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, at xxv (2012) ("Words don't have intrinsic meanings; the significance of an expression depends on how the interpretive community alive at the time of the text's adoption understood those words."). History and convention, therefore, illuminate our understanding of the text.

We are not the first circuit to grapple with how far, and to what extent, the Second Amendment applies outside the home. Two circuits, looking closely at the text and history of the Amendment, have held that the Second Amendment indeed protects a general right to carry firearms in public for self-defense. *See Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017); *Moore v. Madigan*, 702 F.3d 933, 936–37 (7th Cir. 2012).[4] Three others have simply assumed the Second Amendment applies outside the home, without

---

[4] The Illinois Supreme Court has agreed with the reasoning of *Moore* and subsequently held that the Second Amendment applies outside the home. *See People v. Aguilar*, 2 N.E.3d 321, 327 (Ill. 2013) ("[I]f *Heller* means what it says, and 'individual self-defense' is indeed 'the central component' of the second amendment right to keep and bear arms, then it would make little sense to restrict that right to the home, as 'confrontations are not limited to the home.'" (internal citations and brackets omitted) (quoting *Heller*, 554 U.S. at 599 and *Moore*, 702 F.3d at 935–36)).

delving into the historical nature of the right. *See Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013); *Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012).

## III

## A

We start, as we must, with the text. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. It is apparent from the face of the text that the Amendment protects the right not only to "keep" but also to "bear" arms. The latter verb is central to Young's challenge.

*Heller* provides useful guidance. To "bear," the Court explained, means to "wear" or to "carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defense action in a case of conflict with another person." *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). And *Heller* explained that "bear arms" did not solely refer to carrying a weapon as part of a militia. *Id*. at 585. Rather, to "bear" an object means to carry it, and "[w]hen used with 'arms,' . . . the term has a meaning that refers to carrying for a particular purpose— confrontation." *Id.* at 584.

The prospect of confrontation is, of course, not limited to one's dwelling. *See Wrenn*, 864 F.3d at 657 ("After all, the Amendment's core lawful purpose is self-defense, and the need for that might arise beyond as well as within the home." (internal quotations and citations omitted)); *Moore*,

702 F.3d at 941 ("[T]he interest in self-protection is as great outside as inside the home."). Thus, carrying firearms outside the home fits comfortably within *Heller*'s definition of "bear."

Indeed, the fact that the Second Amendment protects bearing *as well as* keeping arms implies some level of public carry in case of confrontation. A right to "keep" arms, on its own, necessarily implies a right to carry those arms to some extent. For instance, in order to "keep" arms, one would have to carry them home from the place of purchase and occasionally move them from storage place to storage place. *Cf. Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (holding that the right to possess firearms "implies a corresponding right to acquire and maintain proficiency in their use"). The addition of a separate right to "bear" arms, beyond keeping them, should therefore protect something more than mere carrying incidental to keeping arms. *See* Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 271 (1880) ("[T]o bear arms implies something more than mere keeping."). Understanding "bear" to protect at least some level of carrying in anticipation of conflict outside of the home provides the necessary gap between "keep" and "bear" to avoid rendering the latter guarantee as mere surplusage. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803) ("[I]t cannot be presumed that any clause in the constitution is intended to be without effect . . . .").

*Heller* and *McDonald* suggest a similar understanding of "bear." *Heller* described the "inherent right of self-defense" as "most acute" within the home, implying that the right exists, perhaps less acutely, outside the home. 554 U.S. at

628.[5] *McDonald* similarly described the right as "most notabl[e]" within the home, implying the right exists, perhaps less notably, outside the home. 561 U.S. at 780. *Heller* also identified "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" as presumptively lawful. 554 U.S. at 626. Why bother clarifying the definition of sensitive public places if the Second Amendment did not apply, at all, to *any* public place?[6]

In short, the text of the Amendment, as interpreted by *Heller* and *McDonald*, points toward the conclusion that "bear" implies a right to carry firearms publicly for self-defense.[7]

### B

We next consider the writings of "important founding-era legal scholars" to discern the original public

---

[5] The Delaware Supreme Court recently adopted this interpretation of *Heller*'s "most acute" language. *See Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 651 n.100 (Del. 2017) ("'[T]he *Heller* Court's statement that 'the need for defense of self, family, and property' is '*most* acute' in the home suggests that the need must be *less* acute elsewhere—but nonetheless present." (quoting *Heller*, 554 U.S. at 628) (internal citation omitted)).

[6] The State's amicus brief asks us to stretch this list of presumptively lawful measures to allow all laws "preserving public safety." This argument borders on the absurd. Surely not all areas of the public are as sensitive as schools or government buildings, nor is it, as the State suggests, a "very small and reasonable step to view virtually the entire public sphere as a 'sensitive place.'"

[7] Strangely, the dissent is content to reach a contrary conclusion and effectively to limit the Second Amendment's protections to within the home without even bothering to grapple with the text of the Amendment.

understanding of the Second Amendment right, because, as *Heller* explains, "[t]hat sort of inquiry is a critical tool of constitutional interpretation." 554 U.S. at 605; *see also Jackson*, 746 F.3d at 960, 962–63.

Several legal treatises that were in wide circulation throughout the founding era support our textual understanding of "bear arms." In an early American edition of Blackstone's *Commentaries on the Laws of England*— indeed, the "most important" edition, as *Heller* points out, *see* 554 U.S. at 594—St. George Tucker, a law professor at the College of William & Mary and former influential Antifederalist, insisted that the right to armed self-defense is the "first law of nature" and that "the right of the people to keep and bear arms" is the "true palladium of liberty." 1 St. George Tucker, *Blackstone's Commentaries: With Notes of Reference to the Constitution and Laws of the Federal Government of the United States; and of the Commonwealth of Virginia* app. n.D. at 300 (Phil., William Young Birch & Abraham Small 1803); *see also McDonald*, 561 U.S. at 769 (treating Tucker's notes on Blackstone as heavily instructive in interpreting the Second Amendment); *Heller*, 554 U.S. at 606 (same). And in advocating for the prerogative of the Judiciary to strike down unconstitutional statutes, Tucker wrote: "If, for example, congress were to pass a law prohibiting any person from bearing arms, as a means of preventing insurrections, the judicial courts, . . . would be able to pronounce decidedly upon the constitutionality of these means." Tucker, *supra*, at 289; *see also* Michael P. O'Shea, *Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of "Bearing Arms" for Self-Defense*, 61 Am. U. L. Rev. 585, 637–38 (2012). Indeed, as Tucker explained, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his

hand, than a European fine gentleman without his sword by
his side." Tucker, *supra*, vol. 5, app., n.B, at 19.

Blackstone himself espoused a similarly sacred view on
the right to bear arms for Englishmen, which was most
notably codified in the 1689 English Declaration of Rights
as the right of Protestants to "have Arms for their Defense
suitable to their Conditions and as allowed by Law." Bill of
Rights 1689, 1 W. & M., c. 2 (Eng.); *see also Alden v. Maine*,
527 U.S. 706, 715 (1999) (noting that Blackstone's works
"constituted the preeminent authority on English law for the
founding generation"). As Blackstone explained, the 1689
Declaration enshrined "the natural right of resistance and
self-preservation" and "the right of having and using arms
for self-preservation and defence." 1 William Blackstone,
Commentaries *144.[8] It followed from Blackstone's
premise that such a right, the predecessor to our Second
Amendment, "was by the time of the founding understood to
be an individual right protecting against both *public* and
private violence." *Heller*, 554 U.S. at 594 (emphasis added);
*see also* 2 William Blackstone, *Commentaries on the Laws
of England* 441 (Edward Christian ed., 1795) ("[E]veryone

---

[8] Blackstone was far from alone in viewing the right to self-defense as
a natural right, thus "belong[ing] to [all] persons merely in a state of
nature, and which every man is intitled to enjoy whether out of society
or in it." 1 WILLIAM BLACKSTONE, COMMENTARIES *119. Quite a few
scholars and commentators of that era on either side of the Atlantic
likewise championed a natural right to defend oneself. *See* Leonard W.
Levy, *Origins of the Bill of Rights* 140–41 (2001) (referencing a 1768
article in the prominent colonial newspaper *A Journal of the Times* that
described the English right as "a natural right which the people have
reserved to themselves, confirmed by the Bill of Rights, to keep arms for
their own defence"); *see also* David B. Kopel, *The Natural Right of Self-
Defense: Heller's Lesson for the World*, 59 Syracuse L. Rev. 235, 242
(2008) ("The Anglo-Americans learned the language of natural rights,
including the natural right of self-defense . . . .").

is at liberty to keep or carry a gun, if he does not use it for the [unlawful] destruction of game.").

## C

Following *Heller*'s historical imperative, we next move to nineteenth century judicial interpretations of the right to bear arms, whether as part of the Second Amendment or analogous state constitutional provisions. *See* 554 U.S. at 605 ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century."). As we will soon discover, many of the same nineteenth century cases marshalled in *Heller* to prove that the Second Amendment secures an individual right to self-defense reveal just as persuasively that the Second Amendment must encompass a right to carry a firearm openly outside the home.

### 1

We begin with *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822), *cited in Heller*, 554 U.S. at 585 n. 9, a decision "especially significant both because it is nearest in time to the founding era and because the state court assumed (just as [*Heller*] does) that the constitutional provision at issue codified a preexisting right." Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1360 (2009). Interpreting Kentucky's Second Amendment analogue—providing that "the right of the citizens to bear arms in defense of themselves and the state, shall not be questioned"—the state's highest court had no doubt that any law restricting the public carry of firearms would "import a restraint on the right of the citizens to bear arms." *Bliss*, 12 Ky. at 90–92. The court then invalidated a restriction on the concealed carry of weapons, despite the availability of open carry,

reasoning that "whatever restrains the full and complete exercise of [the right to bear arms], though not an entire destruction of it, is forbidden by the explicit language of the constitution." *See id*. The *Bliss* court's strict approach to restraints on the *concealed* carry of firearms was an outlier in the Nineteenth Century, *see Peruta II*, 824 F.3d at 935–36, and Kentucky did later amend its constitution to allow the legislature to "pass laws to prevent persons from carrying concealed arms," Ky. Const. art. XIII, § 25. Nonetheless, the Kentucky constitutional convention left untouched the premise in *Bliss* that the right to bear arms protects *open* carry.

In Tennessee, the state's highest court offered its interpretation of the right to bear arms eleven years after *Bliss*. *See Simpson v. State*, 13 Tenn. (5 Yer.) 356 (1833), *cited in Heller*, 554 U.S. at 585 n.9. After he was convicted of disturbing the peace by appearing armed in public, Simpson faulted the indictment for failing clearly to require proof of actual violence. *Id*. at 357–58. The high court agreed, because—even assuming that colonial law did not require proof of actual violence to punish colonists for walking with weapons—the Tennessee "constitution ha[d] completely abrogated it." *Id*. at 360. No such prohibition could survive the state constitution's grant of "an express power . . . secured to all the free citizens of the state to keep and bear arms for their defence, without any qualification whatever as to their kind or nature." *Id*. Absent an act of violence, then, Simpson's indictment for merely carrying firearms could allege no crime tolerable to the constitution of Tennessee. *See id*. at 360–62.

The Alabama Supreme Court joined the chorus seven years later. *See State v. Reid*, 1 Ala. 612 (1840), *cited in Heller*, 554 U.S. at 629. Interpreting the Alabama "right to

bear arms, in defense of []self and the State," the high court declared that an Alabamian must be permitted *some* means of carrying a weapon in public for self-defense. *Id*. at 615–16. The court ultimately upheld a restriction on "the evil practice of carrying weapons secretly," citing the legislature's power "to enact laws in regard to the manner in which arms shall be borne. . . . as may be dictated by the safety of the people and the advancement of public morals." *Id*. at 616. But the court made clear where that power of the legislature ran dry:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.

*See id*. at 616–17.

The Georgia Supreme Court embraced precisely that position six years later, making explicit what *Reid* intimated. *See Nunn v. State*, 1 Ga. 243 (1846), *cited in Heller*, 554 U.S. at 612, 626, 629. There, the Georgia high court considered a Second Amendment challenge to a statute creating a misdemeanor for carrying a pistol, either openly or concealed. *Id*. at 246. Starting off with a clear statement of the constitutional guarantee, the court explained: "The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia,

shall not be infringed, curtailed, or broken in upon, in the smallest degree . . . ." *Id.* at 251 (emphasis omitted). And with those Second Amendment lines properly set, the court held that Georgia's statute went too far:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms. *But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void . . .*

*Id.* (emphasis added). Critically, we must afford *Nunn*'s understanding of the Second Amendment a good deal of weight, because, as *Heller* explains, "[i]ts opinion perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause." 554 U.S. at 612; *see also* O'Shea, *supra*, at 627 ("No case, historic or recent, is discussed more prominently or positively in *Heller* than the Georgia Supreme Court's 1846 decision in *Nunn v. State*.").

The Louisiana Supreme Court soon followed the course set by Alabama and Georgia. *See State v. Chandler*, 5 La. Ann. 489 (1850), *cited in Heller*, 554 U.S. at 613, 626. The high court first rejected Chandler's Second Amendment challenge to a Louisiana law prohibiting concealed carry, reasoning that the law was "absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons." *Id.* at 489–90. But, in precisely the same manner as the *Nunn*

and *Reid* courts, the *Chandler* court drew the line which the legislature could not cross. As the court explained: "[The prohibition on concealed carry] interfered with no man's right to carry arms . . . 'in full open view,' which places men upon an equality. This is the right guaranteed by the Constitution of the United States . . . ." *Id.* at 490; *see also Heller*, 554 U.S. at 613 (citing favorably *Chandler*'s holding that "citizens had a right to carry arms openly").

Thus, each of these nineteenth century cases found instructive by *Heller* when settling the Second Amendment as an individual right to self-defense is just as instructive when evaluating the application of that right outside the home. While nineteenth century legislatures enjoyed latitude to regulate the "manner in which arms shall be borne," no legislature in these states could, "under the pretence of regulating," destroy the right to carry firearms in public altogether. *See Reid*, 1 Ala. at 616–17. Accordingly, even though our court has read these cases to exclude *concealed* carry from the Second Amendment's protections, *see Peruta II*, 824 F.3d at 933–36, the same cases command that the Second Amendment must encompass a right to *open* carry.[9]

---

[9] The dissent faults our reliance on decisions from the South, implying that the thorough analysis found in such opinions must have been the product of a "culture where slavery, honor, violence, and the public carrying of weapons were intertwined." Dissent at 6 (citations and quotations omitted). To say the least, we are puzzled. The dissent overlooks the fact that the Southern cases on which we rely *only arose* because the legislatures in those states had enacted restrictions on the public carry of firearms. Indeed, were it the case that the Southern culture of slavery animated concerns to protect the right to open carry, why would the Georgia legislature have sought to ban open carry in the first place?

2

We are well aware that there were judicial proponents of a more limited right to bear arms during the nineteenth century.

Most prominent is the Arkansas Supreme Court's 1842 interpretation of the right in *State v. Buzzard*, 4 Ark. 18 (1842). There, a divided court upheld an Arkansas prohibition on the concealed carry of "any pistol, dirk, butcher or large knife, or a sword in a cane," but each judge in the splintered majority appeared poised to go much further. Chief Justice Ringo advocated his view that the Second Amendment served as no bar to the Arkansas legislature's authority to restrict *any* carrying of firearms: "[N]o enactment on this subject, which neither directly nor indirectly so operates as to impair or render inefficient the means provided by the Constitution for the defense of the State, can be adjudged invalid on the ground that it is repugnant to the Constitution." *Id.* at 27. But Justice Dickinson went even further, writing that the Second Amendment was nothing "but an assertion of that general right of sovereignty belonging to independent nations to regulate their military force," thus finding *no* individual right within its guarantee. *Id.* at 32; *but see id.* at 34–35 (Lacy, J., dissenting) (viewing the Second Amendment as an individual right to self-defense).

---

As a more fundamental matter, too, we cannot agree with the dissent's choice to cast aside Southern cases. *Heller* placed great emphasis on cases from the South, and *Nunn* in particular. We are an inferior court. Can we really, while keeping a straight face, now say that such cases have little persuasive effect in analyzing the contours of the Second Amendment? We think not.

Several nineteenth century courts hewed to *Buzzard*'s approach and upheld restrictions on the public carry of weapons without emphasizing, as did courts in *Nunn*'s camp, the limits of legislative authority. *See Hill v. State*, 53 Ga. 472, 474–75 (1874) (upholding prohibition on carrying weapons "to any court of justice . . . or any place of public worship, or any other public gathering . . . except militia muster grounds"); *English v. State*, 35 Tex. 473, 474 (1871) (upholding prohibition on carrying "pistols, dirks, daggers, slungshots, swordcanes, spears, brass-knuckles and bowie knives"); *State v. Workman*, 14 S.E. 9, 10–12 (W. Va. 1891) (upholding presumption of criminality "when a man is found going around with a revolver, razor, billy, or brass knuckles upon his person").

Yet, with *Heller* on the books, cases in *Buzzard*'s flock furnish us with little instructive value. That's because *Heller* made clear that the Second Amendment is, and always has been, an individual right centered on self-defense; it has never been a right only to be exercised in connection with a militia. *See, e.g.*, 554 U.S. at 592, 599, 616, 628. And bound as the inferior court that we are, we may only assess whether the right to bear arms extends outside the home *on the understanding* that the right is an individual one centered on self-defense. Thus, *Heller* knocks out the load-bearing bricks in the foundation of cases like *Buzzard*, for those courts only approved broad limitations on the public carry of weapons *because* such limitations in no way detracted from the common defense of the state. *See, e.g.*, *Buzzard*, 4 Ark. at 27 (opinion of Ringo, C.J.) ("The act in question does not, in my judgment, detract anything from the power of the people to defend their free state and the established institutions of the country."); *Hill*, 53 Ga. at 475 ("In what manner the right to keep and bear these pests of society [dirks, bowie knives, and the like], can encourage or secure

the existence of a militia, and especially of a well regulated militia, I am not able to divine."); *English*, 35 Tex. at 477 ("The terms dirks, daggers, slungshots, sword-canes, brass-knuckles and bowie knives, belong to no military vocabulary."); *Workman*, 14 S.E. at 11 ("So, also, in regard to the kind of arms referred to in the amendment, it must be held to refer to the weapons of warfare to be used by the militia . . . ."); *see also Wrenn*, 864 F.3d at 658 (reasoning that such cases are "sapped of authority by *Heller*"); *Moore*, 702 F.3d at 941 (regarding "the historical issues as settled by *Heller*"); O'Shea, *supra*, at 653 (same).[10]

3

Once we set aside each of those cases that rest on a militia-focused view of the right to bear arms, we find only two cases from the nineteenth century that might be read to allow severe deprivations on open carry.

---

[10] Not *all* cases with views of the Second Amendment contrary to *Heller* took the *Buzzard* approach, however. Several of such cases protected the right to bear arms in a way that supports, or is at least consistent with, the right to open carry. *See Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 186–87 (1871) (holding that, if a pistol "is adapted to the usual equipment of the soldier," then a statute that "forbids by its terms the carrying of the weapon publicly or privately, without regard to time or place, or circumstances . . . violates the constitutional right to keep arms."); *Aymette v. State*, 21 Tenn. (2 Hum.) 154, 160 (1840) ("In the nature of things, if they were not allowed to bear arms openly, they could not bear them in their defence of the State at all."); *Cockrum v. State*, 24 Tex. 394, 401–03 (1859) (construing the Second Amendment purely as a tyranny-deterring measure, but nevertheless barring the complete prohibition of carrying a bowie-knife, "an exceeding[ly] destructive weapon").

The first, *State v. Duke*, is an 1874 decision from the Supreme Court of Texas, where the court concluded that the legislature could confine the carry of firearms to certain places, and only when the bearer had reasonable grounds to fear an attack. 42 Tex. 455, 456–59 (1874). Why the departure from the *Nunn* line of cases? One need only take a peek at the Texas constitutional provision that served as the basis for the court's decision, which provided that "[e]very person shall have the right to keep and bear arms in the lawful defense of himself or the State, *under such regulations as the Legislature may prescribe*." *See id.* at 458 (emphasis added). While the Second Amendment surely tolerates some degree of regulation, its very substance is not so explicitly limited by such a regulatory caveat. We shouldn't pencil one in.[11]

The second case, *Walburn v. Territory*, is a decision from the Supreme Court of the Territory of Oklahoma, coming at the very end of the nineteenth century in 1899. 59 P. 972 (Okla. Terr. 1899) (Mem). Convicted of carrying a revolver on his person, Walburn challenged his conviction on several grounds, one of which being an argument that Oklahoma's carrying prohibition was "in conflict with the constitution of the United States." *Id.* at 973. Beyond such a general assertion, however, "[n]o authorities [were] cited in support of this position, nor [was] the proposition very earnestly urged." *Id.* Accordingly, the court rejected the challenge: "*As at present advised*, we are of the opinion that the statute

---

[11] But "even *Duke*, an outlier which marks perhaps the most restrictive interpretation that any nineteenth-century court gave to the defense-based right to bear arms, implicitly rejected no-carry laws as unconstitutional" when it reasoned that the Texas law "respected the right to carry a pistol openly when needed for self-defense." O'Shea, *supra*, at 655 (quoting *Duke*, 42 Tex. at 459).

violates none of the inhibitions of the constitution of the United States, and that its provisions are within the police power of the territory." *Id.* (emphasis added). We see little reason to credit much a decision that explicitly acknowledged a lack of due consideration. *Cf. Heller*, 554 U.S. at 623–24 (rejecting dissent's reliance on *United States v. Miller*, 307 U.S. 174 (1939), in part because of the incomplete briefing in *Miller* and its lack of a thorough consideration of the history of the Second Amendment).

## D

Finally, as did the Court in *Heller*, we turn to the legislative scene following the Civil War. *See* 554 U.S. at 614–16. While considering materials that post-date the Bill of Rights by at least 75 years might stretch the term "*original* public meaning," *Heller* explains that, "[i]n the aftermath of the Civil War, there was an outpouring of discussion of the Second Amendment in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly free slaves." *Id.* at 614. So, although such evidence "do[es] not provide as much insight into [the Second Amendment's] original meaning as earlier sources," we nevertheless consider such evidence somewhat instructive on its meaning.[12] *See id.*

---

[12] This evidence is not more probative when applying the right to state and local governments. While *McDonald* relied extensively on history from the post–Civil War period when deciding whether the right to bear arms is "among those fundamental rights necessary to our system of ordered liberty," thus *incorporating* it against the States, 561 U.S. at 770–78, *McDonald* also made clear that the *substantive* restrictions the right imposes on states are precisely the same as those imposed on the federal government, *id.* at 785–86; *id.* at 805 (Thomas, J., concurring in part and concurring in the judgment) (agreeing that "the right to keep and

Particularly relevant in this period are the efforts of many Southern states to disarm free blacks after the Civil War by adopting Black Codes, because "[t]hose who opposed these injustices frequently stated that they infringed blacks' constitutional right to keep and bear arms." *Heller*, 554 U.S. at 614–16; *see also* Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 Kan. J.L. & Pub. Pol'y 17, 20 (1995) ("The various Black Codes adopted after the Civil War required blacks to obtain a license before carrying or possessing firearms or bowie knives . . . . These restrictive gun laws played a part in provoking Republican efforts to get the Fourteenth Amendment passed.").

The Supreme Court's infamous decision in *Dred Scott v. Sanford*, 60 U.S. 393 (1857), rendered four years before the first shots were fired at Fort Sumter, would pave the way for such Black Codes to proliferate after the war. *See McDonald*, 561 U.S. at 807–08, 822, 849 (Thomas, J., concurring in part and concurring in the judgment) (looking to *Dred Scott* as necessary context in Civil War era historical analysis). Writing for the Court, Chief Justice Taney— disgracefully—dismissed Dred Scott's suit for freedom after concluding that blacks had never been a part of the sovereign "people" of the United States and therefore could find no recourse in an Article III court. *See* 60 U.S. at 407. To hold otherwise, Chief Justice Taney wrote, would have "entitled [blacks] to the privileges and immunities of citizens" and thus granted them the rights he felt only whites could enjoy:

---

bear arms set forth in the Second Amendment [is] '*fully* applicable to the States'" (emphasis added)). Because *Heller* ascribed less weight to evidence from the post-Civil War period when interpreting the Second Amendment's restrictions on the federal government, 554 U.S. at 614, it necessarily follows that the evidence is less probative when interpreting the Amendment's restrictions on state and local governments.

"[I]t would give them the full liberty of speech in public and in private upon all subjects upon which its own citizens might speak; to hold public meetings upon political affairs, and to keep and carry arms wherever they went." *Id.* at 416–17.

Perhaps emboldened by Chief Justice Taney's opinion, "those who sought to retain the institution of slavery . . . [began] to eliminate more and more of the basic liberties of slaves, free blacks, and white abolitionists." *See McDonald*, 561 U.S. at 843–44 (Thomas, J., concurring in part and concurring in the judgment). And the pervasive fear of slave rebellions "led Southern legislatures to take particularly vicious aim at the rights of free blacks and slaves to speak or to keep and bear arms for their defense." *Id.* at 845; *see also* Act of Dec. 23, 1833, § 7, 1833 Ga. Acts 226, 228 ("[I]t shall not be lawful for any free person of colour in this state, to own, use, or carry fire arms of any description whatever.").

The subsequent Civil War was far from a perfect fix to these problems. Those freedmen who had fought for the Union Army during the war frequently returned home "to the States of the old Confederacy, where systematic efforts were made to disarm them and other blacks." *McDonald*, 561 U.S. at 771; *see also The Freedmen's Bureau Bill*, N.Y. Evening Post, May 30, 1866, at 2 ("In South Carolina and Florida the freedmen are forbidden to wear or keep arms."). Emblematic of these efforts was an 1865 law in Mississippi that declared "no freedman, free negro or mulatto . . . shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife." *McDonald*, 561 U.S. at 771 (quoting Certain Offenses of Freedmen, 1865 Miss. Laws p. 165, § 1, *in* 1 *Documentary History of Reconstruction* 289 (W. Fleming ed. 1950)). The law was vigorously enforced. As an 1866 letter from Rodney, Mississippi to the Harper's Weekly

magazine lamented, "[t]he militia of this county have seized every gun and pistol found in the hands of the (so called) freedmen. . . . They claim that the statute laws of Mississippi do not recognize the negro as having any right to carry arms." *The Labor Question at the South*, Harper's Weekly, Jan. 13, 1866, at 19. Seeking help from outside of the state, the letter emphasized that such Mississippi laws did "not protect, but insist[ed] upon infringing on their liberties." *Id.* Worse still, "[w]ithout federal enforcement of the inalienable right to keep and bear arms, . . . militias and mobs were tragically successful in waging a campaign of terror against [newly free slaves]." *McDonald*, 561 U.S. at 856 (Thomas, J., concurring in part and concurring in the judgment).

Such blatant injustices did not continue unnoticed by Congress, which established the Freedmen's Bureau to aid newly freed blacks still suffering in the Reconstruction South. Working to fulfill its mandate, an 1866 report by the Bureau targeted a Kentucky law that sought to deprive freedmen of their Second Amendment rights: "[T]he civil law [of Kentucky] prohibits the colored man from bearing arms . . . . Their arms are taken from them by the civil authorities . . . . Thus, the right of the people to keep and bear arms as provided in the Constitution is *infringed*." *Heller*, 554 U.S. at 614–15 (quoting H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess., 233, 236). But Kentucky was far from the only state subject to scrutiny; a joint congressional report decried a South Carolina practice of "seizing all fire-arms found in the hands of the freedmen." *Id.* at 615 (quoting Joint Comm. on Reconstruction, H.R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, p. 229 (1866) (Proposed Circular of Brigadier General R. Saxton)). The joint report plainly envisioned a right to bear arms outside the home, emphasizing that

freedmen in South Carolina "need [firearms] to kill game for subsistence." *Id.*

Indeed, even those congressmen who *opposed* federal action to protect the rights of freedmen understood the fundamental constitutional rights at stake. Senator Davis of Kentucky acknowledged, alongside the writ of *habeas corpus*, the right "for every man bearing his arms about him *and* keeping them in his house, his castle, for his own defense," but argued that congressional action on the matter would usurp the role of Kentucky in caring for its citizens. *See* Cong. Globe, 39th Cong., 1st Sess. 370–71 (1866) (emphasis added), *cited in Heller*, 554 U.S. at 616.

To summarize the history canvassed thus far: the important founding-era treatises, the probative nineteenth century case law, and the post-civil war legislative scene each reveal a single American voice. The right to bear arms must include, at the least, the right to carry a firearm openly for self-defense.

E

But wait! The dissent says we have yet to consider the impact of historical "good cause" restrictions on the scope of the Second Amendment right to carry a firearm in public. According to the dissent, many states heavily restricted the public carry of weapons absent good cause to fear injury to person or property. Dissent at 65–67. A review of the dissent's evidence compels us to disagree.

Many states during the nineteenth century required people who carried weapons in a disruptive fashion to post a bond (or a "surety") to ensure their good behavior. *See, e.g., The Revised Statutes of the Commonwealth of Massachusetts* 750 § 16 (Boston, Theron Metcalf & Horace Mann 1836)

(hereinafter Mass. Acts). And to enforce the surety requirement, such states commonly relied on a citizen-complaint mechanism. That is, if an arms carrier gave any observer "reasonable cause to fear an injury, or breach of the peace," the observer could complain to his local magistrate, who might then require the disruptive carrier "to find sureties for keeping the peace," generally "for a term not exceeding six months." *See id.* But if the disruptive carrier *also* had "reasonable cause to fear an assault or other injury," such person could be excused from posting sureties despite the complaint. *Id.* As an example of the pieces put together, Michigan's 1846 surety law provided that if any person went armed with an "offensive and dangerous weapon, without reasonable cause to fear an assault or other injury . . . he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace." *The Revised Statutes of the State of Michigan* 692 § 16 (Detroit, Sanford M. Green 1846).

The dissent erroneously characterizes surety laws as imposing a severe restriction on the public carry of weapons absent good cause to fear injury. And its analysis of the actual historical evidence is, in a word, cursory. While the dissent focuses on the exception to the surety requirement for carriers with a specialized need for self-defense, it ignores the clearly limited scope of the requirement in the first place: only upon a well-founded complaint that the carrier threatened "injury or a breach of the peace" did the good cause exception come into play, "by exempting even the accused" from the burden of paying sureties. *Wrenn*, 864 F.3d at 661. Thus, "[a] showing of special need did not expand carrying for the responsible; it shrank burdens on carrying by the (allegedly) reckless." *Id.*

Indeed, what is most troubling about the dissent's historical "analysis" is that it reliably quotes the good cause exception to the surety requirements but hardly mentions the limiting citizen-complaint mechanism present in *virtually every single* one of its quoted sources. *See The Statutes of Oregon* 220 § 17 (Oregon, Asahel Bush 1854) (complainant must possess "reasonable cause to fear an injury, or breach of the peace"); *The Revised Statutes of the Territory of Minnesota* 528 § 18 (Saint Paul, James M. Goodhue 1851) (complainant must possess "reasonable cause to fear an injury or breach of the peace"); *The Revised Statutes of the State of Maine* 709 § 16 (Hallowell, Glazier, Masters & Smith 1847) (complainant must possess "cause to fear an injury or breach of the peace"); *Statutes of the Territory of Wisconsin* 381 § 16 (Albany, Packard, Van Benthuysen & Co. 1839) (complainant must possess "reasonable cause to fear an injury or breach of the peace"); 1836 Mass. Acts 750 § 16 (complainant must possess "reasonable cause to fear an injury, or breach of the peace"). The dissent might wish to set aside the requirements to complain under surety laws, but we suspect those who actually did complain under such laws would hesitate before treating the requirements so lightly. Were a complainant to bring an "unfounded, frivolous or malicious" claim that an arms carrier threatened the public peace, the magistrate would not only dismiss the complaint, but also hold the complainant "answerable to the magistrate and the officer for their fees." *See, e.g.*, 1836 Mass. Acts 749 § 7.[13]

---

[13] Only one of the surety laws cited by the dissent lacks explicit reference to the citizen-complaint mechanism. An 1847 Virginia law provided that if any person went armed with "any offensive or dangerous weapon, without reasonable cause to fear an assault or other injury . . . he may be required to find sureties for keeping the peace." *Acts of the*

In any event, even if all arms carriers without good cause had to post sureties (they did not), the laws would not add much to our analysis. *Heller* saw little weight in historical prohibitions that promised only "a small fine and forfeiture of the weapon (or in a few cases a very brief stay in the local jail)." 554 U.S. at 633. Certainly, an obligation to post a surety fits that mold. Like a small fine, sureties are "'akin to modern penalties for minor public-safety infractions like speeding or jaywalking,' which makes them (in the Court's view) poor evidence of limits on the [Second] Amendment's scope." *Wrenn*, 864 F.3d at 661 (quoting *Heller*, 554 U.S. at 633–34). In fact, sureties seem to us even less noteworthy than small fines, since a disruptive carrier—once he posted a surety—"could go on carrying without criminal penalty." *Id.* And if he refrained from breaching the peace, of course, his money posted as a surety would be returned in a matter of months.

All in all, we are unmoved by the dissent's misguided interpretation of history. While surety laws used the language "reasonable cause," they bear no resemblance to modern-day good cause requirements to carry a firearm.[14]

---

*General Assembly of Virginia* 129 § 16 (Richmond, Samuel Shepherd 1848). But the Virginia law doesn't tell us much about the right of Virginians to carry weapons in public, since it only provided that the arms carrier "may" be required to find sureties, with no clarification. What we do know, however, is that "may" certainly does not mean "shall," neither today nor in 1847.

[14] Nor are we much persuaded by the remainder of the dissent's historical evidence. Dissent at 10–12. The dissent is correct, of course, that near the close of the nineteenth century and the beginning of the twentieth century some states began enacting stricter limitations on the public carry of weapons. *See, e.g.*, 1888 Idaho Sess. Laws 23 (prohibiting public carry of weapons within the "confines of any city, town or

### F

One more historical misconception to dispel.

The County and the State, apparently seeing little room to quarrel with American history, argue that the English right to carry weapons openly was limited for centuries by the 1328 Statute of Northampton, and that we should incorporate wholesale that understanding of English rights into our Constitution's Second Amendment. Exploring fourteenth century English law books (after a thorough dusting) reveals that the statute allowed no ordinary Englishman to "bring . . . force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." Statute of Northampton 1328, 2 Edw. 3, c. 3 (Eng.).[15] But the statute's effects did not remain in the fourteenth century, as it "would become the foundation for firearms regulation in England for the next several centuries." *Peruta II*, 824 F.3d at 930. Our court has

---

village"). But it is difficult to ascribe much weight to isolated statutes, with no record of enforcement, that were enacted so distant from the founding. *Cf. Heller*, 554 U.S. at 632 ("[W]e would not stake our interpretation of the Second Amendment upon a single law . . . that contradicts the overwhelming weight of other evidence . . . ."). And we are particularly reluctant to rely on such statutes given that it is impossible to discern whether they were enacted with a militia or a self-defense oriented view of the right to bear arms in mind. *See* O'Shea, *supra*, at 642–43 (noting the popularity of a "hybrid view" of the Second Amendment during the post-Civil War period, where the right was individual but "the chief function of the right . . . was to support civic purposes such as military readiness").

[15] An "affray," derived from the French word "effraier" meaning "to terrify," is an act that disturbs the peace. *See* 1 William Hawkins, *A Treatise of the Pleas of the Crown* 136, ch. 63, § 1 (1716).

interpreted the statute and its enforcement history as consistently prohibiting concealed carry, *see id.* at 932, but we have not until now considered whether it also prohibited open carry.

1

As one would expect, delineating the precise lines within which a fourteenth century English statute was enforced is a difficult task. *See, e.g.*, See Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 12 (2012). In the immediate period after Parliament enacted the statute, it appears that some English constables were ordered to enforce the statute literally and to arrest all those who dared to "go armed," without regard for the bearer's apparent peacefulness. *See* Letter to the Mayor and Bailiffs of York (Jan. 30, 1334), *in Calendar of the Close Rolls*, Edward III, 1333–1337 294 (H.C. Maxwell-Lyte ed. 1898). But not all English constables faced similar orders; for example, Northumberland officers were ordered in 1332 to arrest only "persons riding or going armed *to disturb the peace.*" Letter to the Keeper and Justices of Northumberland (Oct. 28, 1332), *in Calendar of the Close Rolls*, Edward III, 1330–1333 610 (H.C. Maxwell-Lyte ed. 1898) (emphasis added).

Nevertheless, looking only to Chaucer's fourteenth century England provides little instructive force, particularly because "[c]ommon-law rights developed over time." *See Wrenn*, 864 F.3d at 660. And over the next few centuries, a narrow interpretation of the statute—like that given to Northumberland constables in 1332—began to dominate the English legal landscape. Writing almost 300 years after the statute was enacted, Serjeant William Hawkins, an English legal commentator praised by Blackstone, explained that "no wearing of Arms is within the meaning of this Statute, unless

it be accompanied with such Circumstances as are apt to
terrify the People; from whence it seems clearly to follow,
That Persons of Quality are in no Danger of Offending
against this Statute by wearing common Weapons."
1 William Hawkins, *A Treatise of the Pleas of the Crown*
136 § 9 (1716).[16] Hawkins's narrow interpretation of the
statute was in accord with that of the Court of King's Bench,
which clarified that "the meaning of the [Statute of
Northampton] was to punish people who go armed *to terrify
the King's subjects*." *Sir John Knight's Case*, 87 Eng. Rep.
75, 76, 3 Mod. 117 (K.B. 1686) (emphasis added).[17]

---

[16] Indeed, even some wearing of arms that might have been "apt to
terrify the People" fell outside of the statutes prohibitions, as Hawkins
explained that one who "arm[ed] himself to suppress Rioters, Rebels, or
Enemies" or "upon a Cry made for Arms to keep the Peace" would face
no punishment under the statute. *See id.* at § 10.

[17] We disagree with the view that *Sir John Knight's Case* should
only be read for the proposition that government agents were exempt
from the statute. *See* Charles, *supra*, at 28–30. The case reports leave not
so much as a hint that Knight's loyalty to the Crown was the critical issue
before the Court of King's Bench. Indeed, Knight was charged with
"goeing with a blunderbus in the streets, *to the terrifying his majesties
subjects*." 1 Narcissus Luttrell, *A Brief Historical Relation of State
Affairs from September 1678 to April 1714* 380 (Oxford Univ. Press
1857) (emphasis added). And contemporaneous reports of his acquittal
reported that "sir John Knight, the loyall, was tried at the court of kings
bench for a high misdemeanor, in goeing armed up and down with a gun
att Bristoll; who being tried by a jury of his own citty, that knew him
well, he was acquitted, *not thinking he did it with any ill design*." *Id.* at
389 (emphasis added); *see also Moore*, 702 F.3d at 936 (interpreting the
case in the same manner). After his acquittal, Sir Knight was required to
post a bond for good behavior, *Rex v. Knight*, 90 Eng. Rep. 331,
Comberbach 41 (1686), a peculiar measure for one supposedly cloaked
in government authority.

Of course, an untoward intent to terrorize the local townsfolk was not always needed to face arrest and imprisonment; as Blackstone interpreted the statute—an interpretation credited by *Heller*, 554 U.S. at 627—"going armed, with *dangerous or unusual* weapons, is a crime against the public peace, by terrifying the good people of the land." 4 William Blackstone, Commentaries *148–*149 (emphasis added). Indeed, Hawkins wrote that "a Man cannot excuse the wearing such Armour" even "by alledging that such a one threatened him." Hawkins, *supra*, at 136 § 8. But clearly not *all* weapons can be characterized as "dangerous or unusual," else *Heller*'s exemption of Second Amendment protection for weapons of that kind would swallow the Amendment's protections as a whole. *See* 554 U.S. at 627; *Moore*, 702 F.3d at 936 ("[T]he Court cannot have thought *all* guns are 'dangerous or unusual' and can be banned, as otherwise there would be no right to keep a handgun in one's home for self-defense.").

Consequently, we see little in the more recent historical record to suggest that the Statute of Northampton barred Englishmen from carrying common (not unusual) arms for defense (not terror).

2

More fundamentally, however, we respectfully decline the County's and the State's invitation to import English law wholesale into our Second Amendment jurisprudence. While English law is certainly relevant to our historical inquiry because the Second Amendment "codified a *pre-existing* right," *Heller*, 554 U.S. at 592, our aim here is not merely to discover the rights of the English. Indeed, there is a scholarly consensus that the 1689 English right to have arms was *less protective* than its American counterpart. *See* Jonathan Meltzer, Note, *Open Carry for All: Heller and Our*

*Nineteenth-Century Second Amendment*, 123 Yale L.J. 1486, 1500 (2014); Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 120–21 (1994). That is because the English right was "not available to the whole population, given that it was restricted to Protestants, and like all written English rights it was held only against the Crown, not Parliament." *Heller*, 554 U.S. at 593. Accordingly, it only guaranteed the right of Protestants to have arms "as allowed by law." *See* Malcom, *supra*, at 121, 162. But not all laws that restricted the right of Englishmen to have arms found a place across the Atlantic. As St. George Tucker observed, it would have been strange to apply in the United States an English law that presumed any gathering of armed men was treasonous, because "the right to bear arms is recognized and secured in the [American] constitution itself." *See* Tucker, *supra*, vol. 5, app., n.B, at 19; *see also* Cooley, *supra*, at 270 (noting that the Second Amendment "was adopted with some modification and enlargement from the English Bill of Rights"); William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829) (writing that the English right, unlike the Second Amendment, "is allowed more or less sparingly, according to circumstances").

Thus, instead of stitching into the Second Amendment every odd law that hemmed in the rights of fourteenth century Englishmen, we consider those English laws only to the extent they inform the original public understanding of the Second Amendment. *See Heller*, 554 U.S. at 594 ("*By the time of the founding*, the right to have arms had become fundamental for English subjects." (emphasis added)). With our historical inquiry properly framed, the fog encircling the Statute of Northampton's "true" meaning clears away, for the American understanding and implementation of the

statute was unambiguously consistent with a robust Second Amendment right to open carry.

To the extent the Framers considered the Statute of Northampton as instructive of the pre-existing right to bear arms, they took a narrow view of its prohibitions. *See* Eugene Volokh, *The First and Second Amendments*, 109 Colum. L.Rev. Sidebar 97, 101 (2009). In that vein, Justice James Wilson, a leading drafter of the Constitution, credited Serjeant Hawkins and construed the statute to prohibit arming oneself "with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 2 James Wilson, *Collected Works of James Wilson* 654 (Kermit L. Hall & Mark D. Hall eds. 1967); *see also* Volokh, *The First and Second Amendments*, *supra*, at 101 ("American benchbooks for justices of the peace echoed [Wilson's observation], citing Hawkins . . . ."). William Rawle, a prominent member of the Pennsylvania Assembly that ratified the Constitution, likewise cited Hawkins and wrote that the right to bear arms would not rule out a law prohibiting "the carrying of arms abroad by a single individual, attended with circumstances giving [observers] just reason to fear that he purposes to make an unlawful use of them." Rawle, *supra*, at 126.[18]

---

[18] To the extent that one could read Hawkins as having thought the Statute of Northampton would permit *only* "Persons of Quality" (nobility) to carry weapons, *see* Hawkins, *supra*, at 136 § 9, such a class-based limitation clearly found no place in the United States. Volokh, *The First and Second Amendments*, *supra*, at 101–02. Indeed, neither Justice Wilson nor William Rawle makes any mention of such a limitation when citing Hawkins, nor do any other American sources that we have read. *See* William W. Hening, *The New Virginia Justice, Comprising the Office and Authority of a Justice of the Peace, in the Commonwealth of*

Justice Wilson and William Rawle's reading of the statute is confirmed by the various state weapons carry regulations throughout the founding era and beyond that were expressly modelled after the Statute of Northampton ("Northampton analogues"). *See* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. Forum 121, 128–29 (2015) ("[S]everal early American states expressly incorporated versions of the Statute of Northampton into their laws."). Like the surety laws relied on by the dissent, the state-enacted Northampton analogues only sought to regulate disruptive—or more specifically, terrifying—arms carrying. For example, Massachusetts in 1795 enacted a law authorizing justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, *to the fear or terror of the good citizens*." 1795 Mass. Acts 436 (emphasis added); *see also* 1786 Va. Acts 33 (prohibiting going "armed by night []or by day, in fairs or markets, or in other places, in terror of the Country").

The North Carolina Supreme Court offered a definitive interpretation of its Northampton analogue in 1843, providing us with the benefit of a more thorough discussion of its elements. *State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843). After holding that firearms fell within the reach of the crime, the court clarified:

> [I]t is to be remembered that the carrying of a gun *per se* constitutes no offence. For any lawful purpose—either of business or amusement—the citizen is at perfect liberty

*Virginia* 18 (1795) (discussing Hawkins's explanation of the Statute of Northampton without any reference to "Persons of Quality").

> to carry his gun. It is the wicked purpose—
> and the mischievous result—which
> essentially constitute the crime. He shall not
> carry about this or any other weapon of death
> to terrify and alarm, and in such manner as
> naturally will terrify and alarm, a peaceful
> people.

*Id.* at 422–23. True, the court cited "business or amusement," instead of self-defense, as examples of lawful purposes, but a moment's thought refutes the notion that such a list was exhaustive; surely a North Carolinian wasn't at liberty to carry his rifle only so long as he twirled it in amusement. Rather, it was the "wicked purpose" that "constitute[d] the crime." *Id.* at 423.

3

We thus disagree with the dissent's view that carrying a weapon was itself sufficient to face punishment under a state-enacted Northampton analogue. Dissent at 65 n.1. As that argument goes, when the drafters of virtually every single state Northampton analogue criminalized going armed "to the terror" or "in affray" of others, the terror or affray language was just purposive; that is, "terrorizing the public was the consequence of going armed," so such language was incorporated into the statutes merely to clarify *why* going armed was itself unlawful. *See* Ruben & Cornell, *supra*, at 129–30; Charles, *supra*, at 33.

What an odd way it would be to write a criminal statute! To interpret such language as merely purposive is to remove its operative effect, for if going armed was itself unlawful then clarifying the consequences of going armed adds not an iota of substance to the crime. Of course, "where the text of a clause itself indicates that it does not have operative effect,

such as 'whereas' clauses in federal legislation or the
Constitution's preamble, a court has no license to make it do
what it was not designed to do." *Heller*, 554 U.S. at 578 n.3.
But it is entirely another endeavor to read language mixed in
among operative elements in a criminal statute as merely
purposive. *See id.* ("[O]perative provisions should be given
effect as operative provisions, and prologues as
prologues."); *Ratzlaf v. United States*, 510 U.S. 135, 140–41
(1994) (counseling "heightened" resistance before treating
statutory terms as "words of no consequence . . . when the
words describe an element of a criminal offense"). For
instance, Maine's 1821 Northampton analogue authorized
the arrest of "all affrayers, rioters, disturbers or breakers of
the peace, and such as shall ride or go armed offensively, to
the fear or terror of the good citizens of this State, or such
others as may utter any menaces or threatening speeches."
1821 Me. Laws 285. If riding armed were itself unlawful
*because* it terrorized the good citizens of Maine, it strains
credulity to suggest that Maine drafters would have felt the
need to clarify such reasoning right in the middle of the
statute's operative provisions. Indeed, why only clarify the
consequences of riding armed, and no other prohibited
conduct?

More troubling, reading the "to the terror" language as
merely purposive frequently places a Northampton analogue
in conflict with its neighboring criminal provisions. Take a
closer look at the Northampton analogue in chapter 97
section 13 of Delaware's 1852 Revised Statutes, which—in
familiar fashion—authorized the arrest of "all who go armed
offensively to the terror of the people, or are otherwise
disorderly and dangerous." *Revised Statutes of the State of
Delaware, to the Year of Our Lord One Thousand Eight
Hundred and Fifty-Two, Inclusive* 333 § 13 (Dover, W.B.
Keen 1852). With that provision in mind, turn to Section 30,

where the Delaware Code authorized justices of the peace to "punish any slave . . . who shall, without the special permission of his master, go armed with any dangerous weapon." *Id.* at 336 § 30. How might one grant another permission to "go armed with any dangerous weapon" if one had no lawful authority to go armed in the first place? Or consider Tennessee's 1831 Revised Statutes, which, immediately after providing its standard-form Northampton analogue, authorized sheriffs to arrest any person "armed with the intention of committing a riot or affray." 1 *The Statute Laws of the State of Tennessee, of a Public and General Nature* 10 (Knoxville, John Haywood & Robert L. Cobbs 1831). Why on earth would Tennessee have so limited a sheriff's authorization to arrest if going armed was itself unlawful?

Thus, utterly confused by how we might read a Northampton analogue to prohibit all arms carry, we feel the better approach with these statutes is to take them at their word: an American, just like an Englishman, could not go armed offensively to the terror of the people. Such a reasonable restriction on public carry is perfectly consistent with a robust right peacefully to carry a firearm in public. In all, then, the various Northampton analogues found in states across the United States confirm that, "whatever Northampton banned on the shores of England," the American right to carry common weapons openly for self-defense "was not hemmed in by longstanding bans on carrying." *Wrenn*, 864 F.3d at 660–61.

## G

Concluding our analysis of text and review of history, we remain unpersuaded by the County's and the State's argument that the Second Amendment only has force within the home. Once identified as an individual right focused on

self-defense, the right to bear arms must guarantee *some* right to self-defense in public. While the concealed carry of firearms categorically falls outside such protection, *see Peruta II*, 824 F.3d at 939, we are satisfied that the Second Amendment encompasses a right to carry a firearm openly in public for self-defense. Because section 134-9 restricts Young in exercising such right to carry a firearm openly, it burdens conduct protected by the Second Amendment.

## IV

Accordingly, we must evaluate section 134-9 under "an appropriate level of scrutiny." *Jackson*, 746 F.3d at 962. In doing so, we consider "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Id.* at 963 (internal quotations omitted).

We treat this approach as a "sliding scale." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). On one end, "[a] law that imposes such a severe restriction on [a] core right [of the Amendment] that it 'amounts to a destruction of the . . . right,' is unconstitutional under any level of scrutiny." *Jackson*, 746 F.3d at 961 (quoting *Heller*, 554 U.S. at 629). On the other end of the spectrum, intermediate scrutiny is appropriate if the challenged law "does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right." *Id.*

## A

So, what constitutes the core of the Second Amendment? As we know, the Second Amendment protects the right "to keep and bear arms." U.S. Const. amend. II. The key inquiry is whether the core of the right encompasses *both* verbs, or only one: keeping *and bearing* arms for self-defense, or,

more narrowly, only keeping arms for self-defense within the home.[19]

*Heller* aids our inquiry but provides no definitive answer. On the one hand, in rejecting the collective view of the right, *Heller* made clear that "self-defense had little to do with the right's *codification*; it was the *central component* of the right itself." 554 U.S. at 599 (emphasis in original); *see also id*. at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right."). On the other hand, *Heller* noted that "whatever else [the Amendment] leaves to future evaluation, it surely elevates above all other

---

[19] We disagree with the dissent that our circuit has already determined whether the Second Amendment's core applies outside the home. Dissent at 14. As underscored by our recent en banc decision in *Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc), our circuit has not yet decided the extent to which Second Amendment rights—let alone core rights—exist outside of the home. *See id.* at 686 n.19 ("We have not decided the degree to which the Second Amendment protects the right to bear arms outside the home.").

To the extent that other cases in our circuit might have, in passing, indicated that publicly carrying firearms falls outside the right's core, the question was not squarely presented in those cases because each dealt with restrictions on keeping arms *within the home. See, e.g., Chovan*, 735 F.3d at 1129–30 (evaluating 18 U.S.C. § 922(g)'s prohibition on domestic violence misdemeanants from "possessing firearms for life"). Naturally, then, no such case seriously grappled with the existence of core rights outside the home. Indeed, we doubt our court would have resolved in a sentence or two an issue that the *Wrenn* majority and dissent debated extensively. *See Wrenn*, 864 F.3d at 657–64, 668–69; *see also United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001) (en banc) (Kozinski, J., concurring) ("Of course, not every statement of law in every opinion is binding on later panels. Where it is clear that a statement is made casually and without analysis, where the statement is uttered in passing without due consideration of the alternatives, or where it is merely a prelude to another legal issue that commands the panel's full attention, it may be appropriate to re-visit the issue in a later case.").

interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. We recognize that several of our sister circuits have interpreted this language to limit the Amendment's core to the home. *See Drake*, 724 F.3d at 431; *Woollard*, 712 F.3d at 874; *Kachalsky*, 701 F.3d at 93. But we afford little weight to *Heller*'s emphasis on the application of the Second Amendment to the home specifically, for the challenge there exclusively concerned handgun possession in the home. 554 U.S. at 575–76; *see also Drake*, 724 F.3d at 445 (Hardiman, J., dissenting). And in any event, it may very well be the case that within the core of the Amendment, self-defense at home is "most acute." *Heller*, 554 U.S. at 628.

But much of *Heller*'s reasoning implied a core purpose of self-defense *not* limited to the home. The Court cited "at least seven [state constitutional provisions that] unequivocally protected an individual citizen's right to self-defense," which is "strong evidence that that is how the founding generation conceived of the right." *Id.* at 603. Also without any reference to the home, *Heller* noted that "[a]ntislavery advocates routinely invoked the right to bear arms for self-defense," *id.* at 609, including Joel Tiffany, who wrote "the right to keep and bear arms, also implies the right to use them if necessary in self defence; without this right to use the guaranty would have hardly been worth the paper it consumed." *Id.* (quoting Joel Tiffany, *A Treatise on the Unconstitutionality of American Slavery* 117–18 (1849)). Charles Sumner's famous "Bleeding Kansas" speech, quoted at length in *Heller*, can hardly be read without sensing its vociferous declaration that the Second Amendment's core reaches self-defense on the American frontier: "Never was this efficient weapon [the rifle] more needed in just self-defense, than now in Kansas, and at least one article in our National Constitution must be blotted out,

before the complete right to it can in any way be impeached." *Id.* (quoting The Crime Against Kansas, May 19–20, 1856, *in American Speeches: Political Oratory From the Revolution to the Civil War* 553, 606–07 (T. Widmer ed. 2006)); *see also McDonald*, 561 U.S. at 775 ("[O]ne of the 'core purposes of the Civil Rights Act of 1866 and of the Fourteenth Amendment was . . . to 'affirm the full and equal right of every citizen to self-defense.'" (quoting Akhil Amar, *The Bill of Rights: Creation and Reconstruction* 264–65 (1998)).

Hence, we heed *Heller*'s—and *McDonald*'s—admonition that citizens be allowed to use firearms "for the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630, *quoted in McDonald*, 561 U.S. at 768; *see also Wrenn*, 864 F.3d at 659 ("Whatever motivated the Amendment, at its core was the right to self-defense."). While the Amendment's guarantee of a right to "keep" arms effectuates the core purpose of self-defense within the home, the separate right to "bear" arms protects that core purpose outside the home. Indeed, *Heller* tied together the core rights of keeping and bearing firearms in precisely the same manner. When describing the "[f]ew laws in the history of our Nation [that] have *come close* to the severe restriction of the District's handgun ban [within the home]," *Heller* pointed to several state statutes that severely restricted the open carrying of firearms *outside the home*. 554 U.S. at 629 (emphasis added) (citing *Reid*, 1 Ala. at 612; *Nunn*, 1 Ga. at 251; *Andrews*, 50 Tenn. at 187).

We are unpersuaded that historical regulation of public carry requires us to remove the right to bear arms from the Second Amendment's core protection. *See, e.g.*, *Kachalsky*, 701 F.3d at 94; *United States v. Masciandaro*, 638 F.3d 458, 470– 71 (4th Cir. 2011). As the D.C. Circuit has explained,

"[t]he rights to keep and to bear, to possess and to carry, are equally important inasmuch as regulations on each must leave alternative channels for both." *Wrenn*, 864 F.3d at 662. Regulations on public carry tend to "leave alternative channels" for self-defense outside the home, *id.*, because "[w]hen a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places," *Moore*, 702 F.3d at 940.[20] The prevalence of modest regulations on bearing arms, such as a restriction on carrying firearms in a school-zone, does not itself indicate that *bearing* arms is any less protected than *keeping* arms, because the Second Amendment tolerates equally modest restrictions on keeping firearms, such as open surface restrictions in the home. *Wrenn*, 864 F.3d at 663. Thus, historical restrictions on public carry "go to show the scope of the right, not its lack of fundamental character." *See McDonald*, 561 U.S. at 802.

In sum, we reject a cramped reading of the Second Amendment that renders to "keep" and to "bear" unequal guarantees. *Heller* and *McDonald* describe the core purpose of the Second Amendment as self-defense, *see Heller*, 554 U.S. at 599; *McDonald*, 561 U.S. at 787, and "bear"

---

[20] The dissent mischaracterizes the Seventh Circuit's decision in *Moore*. According to the dissent, *Moore* did not address whether the "core" of the Second Amendment includes the right to bear arms outside the home. Dissent at 3. That is incorrect. While not discussing the core as explicitly as we do here, *Moore* did make clear that the Second Amendment "confers a right to bear arms for self-defense, *which is as important outside the home as inside.*" 702 F.3d at 942 (emphasis added); *see also id.* at 941 ("[T]he interest in self-protection is as great outside as inside the home."). And at the very least, *Moore* rejected our dissenting colleague's attempt "[t]o confine the right to be armed to the home [and thereby] to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald.*" *Id.* at 937.

effectuates such core purpose of self-defense in public. We are persuaded, therefore, that the right to carry a firearm openly for self-defense falls within the core of the Second Amendment.

## B

We next ask whether section 134-9 "amounts to a destruction" of the core Second Amendment right to carry a firearm openly for self-defense. *Silvester*, 843 F.3d at 821. If so, the law is "unconstitutional under any level of scrutiny." *Id*.

As previously explained, section 134-9 limits the open carry of firearms to people engaged in the protection of life and property, and even those lucky few may carry firearms only when in the actual course of their duties. Counsel for the County acknowledged as much at oral argument, stating that, to his knowledge, no one other than a security guard—or someone similarly employed—had ever been issued an open carry license.

Restrictions challenged under the Second Amendment must be analyzed with regard to their effect on the typical, law-abiding citizen. *Wrenn*, 864 F.3d at 665 ("[I]f the Amendment is for law-abiding citizens as a rule, then it must secure gun access at least for each typical member of that class." (emphasis omitted)). That's because the Second Amendment protects the right of *individuals* to keep and to bear arms, not *groups* of individuals. *See Heller*, 554 U.S. at 595. An individual right that does not apply to the ordinary citizen would be a contradiction in terms; its existence instead would wax and wane with the whims of the ruling majority.

Restricting open carry to those whose job entails protecting life or property necessarily restricts open carry to a small and insulated subset of law-abiding citizens. Just as the Second Amendment does not protect a right to bear arms only in connection with a militia, it surely does not protect a right to bear arms only as a security guard. The typical, law-abiding citizen in the State of Hawaii is therefore entirely foreclosed from exercising the core Second Amendment right to bear arms for self-defense.[21] It follows that section 134-9 "amounts to a destruction" of a core right, and as such, it is infirm "[u]nder any of the standards of scrutiny." *See id.* at 628. Thus, we hold that section 134-9's limitation on the open carry of firearms to those "engaged in the protection of

---

[21] We do not address whether, after *Peruta II*, a concealed carry regime could provide a sufficient channel for typical, law-abiding citizens to exercise their right to bear arms for self-defense. *See* 824 F.3d at 927. While the County's police chief purportedly awaits an "exceptional case" to grant a concealed carry license, section 134-9 is effectively a ban on the concealed carry of firearms. As counsel for the County openly admitted at oral argument, *not a single concealed carry license* has ever been granted by the County. Nor have concealed carry applicants in other counties fared much better: Hawaii counties appear to have issued only *four* concealed carry licenses in the past *eighteen years. See* 2000 Haw. Att'y Gen. Reps., *Firearm Registrations in Hawaii, 2000 et seq*; *see also City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004) ("We may take judicial notice of a record of a state agency not subject to reasonable dispute."). And there is no dearth of applicants. *See, e.g.*, 2016 Haw. Att'y Gen. Rep., *Firearm Registrations in Hawaii, 2016* at 9 (noting all 27 applicants for concealed licenses in the State were denied); 2015 Haw. Att'y Gen. Rep., *Firearm Registrations in Hawaii, 2015* at 9 (noting all 44 applicants for concealed licenses in the State were denied); 2014 Haw. Att'y Gen. Rep., *Firearm Registrations in Hawaii, 2014* at 9 (noting all 21 applicants for concealed licenses in the State were denied). Thus, even if the State and County remain free to accommodate the right to bear arms with concealed carry after *Peruta II*, an issue we do not decide, section 134-9 does not offer a realistic opportunity for a concealed carry license.

life and property" violates the core of the Second
Amendment and is void; the County may not constitutionally
enforce such a limitation on applicants for open carry
licenses.

V

Notwithstanding the fact that section 134-9 eviscerates a
core Second Amendment right—and must therefore be
unconstitutional—the dissent would uphold the law under
intermediate scrutiny. We do not wish to dive into the weeds
of intermediate scrutiny, but we feel obligated to note a few
aspects of the dissent's analysis that are patently inconsistent
not only with intermediate scrutiny, but with the judicial role
itself.

A

As an initial mistake, the dissent chooses to analyze
section 134-9 as a "good cause" requirement to carry a
firearm in public, similar to those upheld by the Second,
Third, and Fourth Circuits. Dissent at 72–73; *see Kachalsky*,
701 F.3d at 101; *Drake*, 724 F.3d at 434; *Woollard*, 712 F.3d
at 876. The dissent emphasizes the language of section 134-
9 that purportedly authorizes the issuance of a concealed
carry license in an "exceptional case." Yet, to analyze
section 134-9 as such, the dissent must shut its eyes to the
inconvenient fact that no concealed carry license has ever
been granted by the County.

The dissent claims that we lack a factual basis to
acknowledge that reality, but the dissent is clearly wrong.
The County's attorney *conceded* at oral argument that no
concealed carry license has ever been granted by the County.
The dissent gives short shrift to such concession, but it is
nothing more than elementary that a party "is bound by

concessions made in its brief or at oral argument." *Hilao v. Estate of Marcos*, 393 F.3d 987, 993 (9th Cir. 2004). Besides, official (and thus judicially noticeable) reports from the State's Attorney General confirm what the County concedes: at least since 2000, no concealed carry license has been granted by the County. *See supra*, note 21. And even if some truly "exceptional" person in the County might one day receive a concealed carry license, it would be extraordinary to hold such a purely hypothetical stroke of luck to be sufficient in safeguarding a constitutional right.

The Second, Third, and Fourth Circuits certainly did not make such a leap. Those circuits, quite unlike the dissent, confirmed that the good cause requirements at issue did not disguise an effective ban on the public carry of firearms. As the Second Circuit flatly insisted, "New York's proper cause requirement does not operate as a complete ban on the possession of handguns in public." *Kachalsky*, 701 F.3d at 91. Likewise, the Third Circuit observed that New Jersey's regime provided "clear and specific" standards, "accompanied by specific procedures that provide 'safeguards against arbitrary official action.'" *Drake*, 724 F.3d at 435 (footnote omitted) (quoting *Siccardi v. State*, 59 N.J. 545, 555 (1971)); *see also Woollard*, 712 F.3d at 869, 881 & n.10 (distinguishing Maryland's law, which allowed for licenses on a showing of a "good and substantial reason," from the outright ban invalidated by *Moore*, 702 F.3d at 940). And each of the good cause regimes that were upheld provided for administrative or judicial review of any license denial, *Kachalsky*, 701 F.3d at 87; *Drake*, 724 F.3d at 429; *Woollard*, 712 F.3d at 870, a safeguard conspicuously absent from Hawaii's laws. Far from supporting the dissent's argument, then, the reasoning of the Second, Third, and Fourth Circuits suggests that they too

would invalidate a firearms carry regime as restrictive as Hawaii's.

We should also note the perplexing nature of the dissent's reasoning on this point. Suppose the dissent were correct that "[n]o record has been developed in this case" sufficient to discount section 134-9's "exceptional case" avenue. Dissent at 73. Utilizing the lack of such evidence to uphold section 134-9 as a good cause requirement—thus rejecting Young's claim—would plainly be inappropriate at this juncture. Young's action sits at the motion to dismiss stage. Are we now to dismiss claims under Rule 12(b) for *a lack of record evidence*? Of course not!

### B

Beyond the dissent's misconception about how section 134-9 operates, its analysis under intermediate scrutiny is utterly unpersuasive.

### 1

First, and foremost, the dissent chooses to omit one-half of the inquiry. According to the dissent, the only question a court must answer under intermediate scrutiny is whether the government action "promotes a substantial government interest that would be achieved less effectively absent the regulation." Dissent at 74 (quoting *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015)). That is incomplete, because a court must *also* determine whether the government action "'burden[s] substantially more [protected conduct] than is necessary to further' that interest." *Turner Broad. Sys., Inc. v. F.C.C.* (*Turner II*), 520 U.S. 180, 213–14 (1997) (quoting *Turner Broad. Sys., Inc. v. F.C.C.* (*Turner I*), 512 U.S. 622, 662 (1994)); *see also Shapero v. Ky. Bar Ass'n*, 486 U.S. 466, 476 (1988) (invalidating a flat ban on

direct-mail solicitation by lawyers because the government could regulate "abuses . . . through far less restrictive and more precise means"). Thus, while intermediate scrutiny surely does not require the government to pursue the *least* restrictive means of achieving an important interest, the substantial overbreadth or impreciseness of a government action must be considered.

Here, however, the dissent simply points out Hawaii's low firearm death rate and claims victory, at no point seriously analyzing whether the State could reduce gun violence through means considerably more targeted than section 134-9.

2

Confounding the dissent's erroneous understanding of intermediate scrutiny is its willingness to defer entirely to the State regarding the constitutionality of section 134-9. Dissent at 74–75. The dissent relies on the Supreme Court's decision in *Turner Broadcasting* to justify its analysis, but in reality the decision undermines the level of deference the dissent would offer.

"Although we do 'accord substantial deference to the predictive judgments' of the legislature" when conducting intermediate scrutiny, "the [State] is not thereby 'insulated from meaningful judicial review.'" *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1259 (D.C. Cir. 2011) (quoting *Turner II*, 520 U.S. at 195 & *Turner I*, 512 U.S. at 666). Quite the contrary, a court must determine whether the legislature has "base[d] its conclusions upon substantial evidence." *Turner II*, 520 U.S. at 196. Indeed, despite the deference owed, the State bears the burden "affirmatively [to] establish the reasonable fit we require." *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989).

The State and County here offer some empirical studies in support of their argument that section 134-9 is a reasonable means of reducing gun violence, but where does the dissent actually engage with such evidence? It doesn't. Its analysis of the evidence is nothing more than the conclusory assertion that "Hawaii has met its burden by *citing* to significant empirical evidence [apparently two or so pages in its brief is "significant"] and by explaining the logical inferences behind its policy choices." Dissent at 75 (emphasis added).

Mere citation is an inadequate application of intermediate scrutiny, even according deference to the predictive judgment of a legislature, and *Turner Broadcasting* itself shows why. There, the Supreme Court extensively analyzed over the course of *twenty pages* the empirical evidence cited by the government, and only then concluded that the government's "policy [was] grounded on reasonable factual findings supported by evidence that is substantial for a legislative determination." *See Turner II*, 520 U.S. at 196–224. To say that the dissent's treatment of the State's evidence is in any way comparable to the analysis of *Turner Broadcasting* is to omit nearly the entirety of the Court's opinion; the Court did much more than cite-check the government's brief.

The dissent is comfortable letting the State perform its intermediate scrutiny analysis because "[i]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments." Dissent at 74 (quoting *Kachalsky*, 701 F.3d at 99). No statement could more clearly indicate where the dissent goes wrong: we are certainly *not* evaluating a mere "policy judgment" but rather determining the scope and application of a *constitutional right*. At bottom, the dissent would have us fundamentally reject

*Heller* and construe the Second Amendment as nothing more than an illusory promise. While the dissent might think *Heller* was wrongly decided, it is far beyond our power to overrule it.

## VI

We do not take lightly the problem of gun violence, which the State of Hawaii "has understandably sought to fight . . . with every legal tool at its disposal." *Wrenn*, 864 F.3d at 667. We see nothing in our opinion that would prevent the State from *regulating* the right to bear arms, for the Second Amendment leaves the State "a variety of tools for combatting [the problem of gun violence], including some measures regulating handguns." *Heller*, 554 U.S. at 636.

But, for better or for worse, the Second Amendment does protect a right to carry a firearm in public for self-defense. We would thus flout the Constitution if we were to hold that, "in regulating the manner of bearing arms, the authority of [the State] has no other limit than its own discretion." *Reid*, 1 Ala. at 616. While many respectable scholars and activists might find virtue in a firearms-carry regime that restricts the right to a privileged few, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636.

Young has indeed stated a claim that section 134-9's limitations on the issuance of open carry licenses violate the Second Amendment.[22]

**REVERSED** as to the County, **DISMISSED** as to the State,[23] and **REMANDED** for further proceedings consistent with this opinion.[24]

---

CLIFTON, Circuit Judge, dissenting:

Morris Udall once observed at a congressional committee hearing that "everything has been said but not everyone has said it." After decades of relative inattention, the Second Amendment has sparked substantial comment in the last forty years. Others have said things that reflect my view. I do not feel the need to repeat them.

---

[22] Because we reverse the district court on Second Amendment grounds, we need not reach Young's due process claim.

[23] The appeal as to the State is dismissed for the reasons discussed in footnote 1.

[24] We deal with the pending motions as follows: (1) The County's motion to strike Young's 28(j) letters, ECF No. 20, is **DENIED**; (2) Young's motion to file a supplemental brief, ECF No. 24, is **GRANTED**; (3) Young's motion to strike the State's amicus brief, ECF No. 36, is **DENIED**; (4) Young's motion to take judicial notice, ECF No. 80, is **GRANTED IN PART**, and we take judicial notice of the Hawaii Attorney General's 2014 Firearms Registration Report; (5) Young's second motion to file a supplemental brief, ECF No. 84, is **GRANTED**; (6) The State's motion to file a supplemental amicus brief, ECF No. 92, is **GRANTED**.

Following the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), our court has spoken more than once regarding the reach of the Second Amendment. This case requires us to do so again. One notable decision by our court was *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) (*Peruta I*). It expressed an interpretation of the Second Amendment and an explanation for that understanding very similar to the majority opinion in this case. This court voted to rehear *Peruta I* en banc, however, and effectively overturned that decision in *Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc) (*Peruta II*). Our opinion in *Peruta II* contained a lengthy discussion of history relevant to the Second Amendment, including the right to bear arms in old England, colonial America, and in the United States following adoption of the Fourteenth Amendment. It is sufficient for now to say that its assessment was different from that contained in *Peruta I* and in the opinion of the majority here.

The *Peruta II* en banc panel did not opine on the precise question presented in this case, limiting its holding to the conclusion that "the Second Amendment does not preserve or protect a right of a member of the general public to carry concealed firearms in public." *Id*. at 924. As the majority opinion notes, at 10, that decision left unresolved the question of whether the Second Amendment supports the right of a member of the general public to carry a firearm openly in public.

A majority of the members of the *Peruta II* en banc panel expressed additional views relevant to our current case in a non-precedential fashion, however. In a separate concurring opinion. Judge Graber, joined by two other members of the

panel, fully concurred in the en banc panel's majority opinion but went on to express the view that even if it was assumed that the Second Amendment applied to the carrying of concealed weapons, the restrictions at issue in that case struck "a permissible balance between granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets." *Id.* at 942 (internal quotation omitted). The other four judges on the panel who made up the majority stated that "if we were to reach that question, we would entirely agree with the answer the concurrence provides." *Id.* In sum, seven of the eleven members of that en banc panel expressed views that are inconsistent with the majority opinion in this case.

Other circuit courts have weighed in as well. One other circuit has expressed an opinion that aligns with the majority opinion here: *Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017). One has decided that the Second Amendment protects the right to carry firearms in public, generally agreeing with the conclusion of the majority here, but it did not describe that right as part of the "core" of the Second Amendment, as the majority has here: *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012). Three others have reached contrary conclusions: *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013), *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013), and *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012).

In light of the already existing circuit split, I assume that the Supreme Court will find it appropriate at some point to revisit the reach of the Second Amendment and to speak more precisely to the limits on the authority of state and local governments to impose restrictions on carrying guns in public. In the meantime, this court and our counterparts

elsewhere will do the best we can to sort out the conflicting arguments. I respect the opinion of the majority, but my conclusion is different.

H.R.S. § 134-9 regulates both open carry and concealed carry. Open carry licenses are available to those who are "engaged in the protection of life and property" and "[w]here the urgency or the need has been sufficiently indicated." Concealed carry licenses are available "[i]n an exceptional case, when an applicant shows reason to fear injury to the applicant's person or property." H.R.S. § 134-9.

In my view, this statutory scheme is the same type of "good cause" public carry regulation that the Second, Third, and Fourth Circuits upheld in *Kachalsky*, *Drake*, and *Woollard*, respectively. Good cause licensing schemes, and extensive state regulation of public carry more generally, have a long history in the United States. While explicitly declining to elaborate on specific regulations, the Supreme Court in *Heller* expressly noted that the right secured by the Second Amendment is "not unlimited" and that there were "longstanding prohibitions" that were "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n. 26. I would hold that Hawaii's statute is a longstanding, presumptively lawful regulation under *Heller*. At a minimum, the statute survives intermediate scrutiny, as the core of the Second Amendment does not include a general right to publicly carry firearms and there is a reasonable fit between the licensing scheme and Hawaii's legitimate interest in promoting public safety.

As a result, I respectfully dissent. As promised, I will try not to repeat all that has already been said by other judges. I will limit my comments to a few additional thoughts about the historical record and the application of intermediate scrutiny to the statute at hand.

## I. History

The majority opinion's conclusions rest heavily on historical analysis in the vein of the Supreme Court's decisions in *Heller* and *McDonald*. The premise of that approach is that the history of firearms regulations prior to the adoption of the Second Amendment and in the decades that followed that adoption shed light on the right that the founders intended to provide. Much of the analysis offered in the majority opinion repeats what was said in *Peruta I*, despite the en banc rejection of that opinion in *Peruta II*.

The discussion in the majority opinion is incomplete, at best. Throughout our history, states and their predecessor colonies and territories have taken divergent approaches to the regulation of firearms. While some, like the states that the majority cites, have historically allowed for a general right to publicly carry firearms, many others have not. "History and tradition do not speak with one voice here. What history demonstrates is that states often disagreed as to the scope of the right to bear arms, whether the right was embodied in a state constitution or the Second Amendment." *Kachalsky*, 701 F.3d at 91.

The majority opinion supports its conclusion by focusing solely on the laws and decisions from one region, the antebellum South. Take a look at the jurisdictions relied upon by the majority opinion, at 19–23: Kentucky, Tennessee, Alabama, Georgia, and Louisiana. What jumps out is that those were all slave states, and the decisions relied upon by the majority opinion all date from before the Civil War. The majority opinion affirmatively acknowledges, at 28–32, the peculiar pattern of southern states following the Civil War, during the era of Black Codes and efforts to keep firearms out of the hands of former slaves, but it fails to appreciate that the peculiarity did not start in 1865. To

suggest that the approach of the antebellum South reflected a national consensus about the Second Amendment's implications for public carry of firearms is misguided. The cases from the antebellum South relied upon by the majority "did not emerge in a vacuum and do not reflect the full range of American legal history. Rather, they come from a time, place, and culture where slavery, honor, violence, and the public carrying of weapons were intertwined." Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry*, 125 Yale L.J. F. 121, 125 (2015), http://www.yalela wjournal.org/forum/firearm-regionalism-and-public-carry.

A more balanced historical analysis reveals that states have long regulated and limited public carry of firearms and, indeed, have frequently limited public carry to individuals with specific self-defense needs. Hawaii's regulatory framework fits squarely into that long tradition.

There are two legal conclusions to be drawn from a more thorough historical analysis. First, good cause licensing schemes are longstanding and, therefore, are presumptively lawful limitations on public carry of firearms under *Heller*. Second, even if they are not presumptively lawful, the widespread and longstanding nature of such schemes supports the conclusion that a general right to publicly carry firearms is not part of the core of the Second Amendment.

## A.  An Overview of State Regulation of Public Carry

Other decisions have detailed much of the history of regulations and limitations on public carry, so I need not fully reiterate that history here. I will instead provide only a brief overview of the tradition of regulation of public carry, with reference to the analysis performed by our court and other circuits where appropriate.

As we recognized in our en banc *Peruta II* decision, regulation of public carry has its roots in English law. Dating back to the thirteenth century, England regulated public carry of firearms, including both concealed and concealable weapons. *See Peruta II*, 824 F.3d at 929–32 (citing, *inter alia*, the Statute of Northampton, which prohibited men "to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere" and subsequent laws emphasizing that the Statute prohibited the carrying of concealable weapons).[1] In the colonial period, several colonies "adopted verbatim, or almost verbatim, English law" that limited or banned public carry. *Id.* at 933.

In the late 18th and 19th centuries, states began to develop good cause limitations or otherwise continued to limit public carry. The Second Circuit detailed much of the 19th century history in *Kachalsky*, 701 F.3d at 90–93.

---

[1] The majority's analysis of English law and the colonies' treatment of English law, at 36–45, is also flawed. For example, the majority assumes that historical regulations authorizing the arrest of or criminalizing going armed "to the fear or terror" of the public mean that the person who goes armed must have had the *intent* to terrify the public. *See, e.g.*, Maj. Op. at 42–45. But the majority opinion does not cite adequate authority for that proposition, and there is no consensus that supports such an interpretation. Another equally reasonable interpretation is that these statutes meant that a member of the general public could not go armed because to do so would terrify the people, and the statutes included this language to "highlight[] the importance of the police power in preventing the dangers imposed by public carrying . . . . The terminology did not legally require circumstances where carrying of arms was unusual and therefore terrifying. Instead, the act of riding or going armed among the people was deemed terrifying itself and considered a breach against the public peace." Patrick J. Charles, *The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1, 33 (2012).

Massachusetts, for example, first adopted a good cause statute in 1836. Its law provided an exception to its limitation on public carry for those with "reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property." 1836 Mass. Laws 748, 750, ch. 134, § 16. Under this law, any person who went armed without such good cause "may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace." *Id.* Wisconsin, Oregon, Minnesota, Michigan, Virginia, and Maine adopted similar laws. *See* Act to Prevent the Commission of Crimes, § 16, reprinted in The Statutes of the Territory of Wisconsin 379, 381 (1839) (restricting "go[ing] armed with a . . . pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury."); Proceedings to Prevent Commission of Crimes, ch. 16, § 17, 1853 Or. Laws 220 (restricting any person from going armed with "pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault, injury, or other violence to his person, or to his family or property."); Of Proceedings to Prevent the Commission of Crime, ch. 193, § 16, reprinted in Thomas M. Cooley, Compiled Laws of the State of Michigan 1572 (1857) (restricting any person from going armed with a "pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury"); Of Proceedings to Prevent the Commission of Crimes, 1847 Va. Laws 129, ch. 14, § 16 (restricting "go[ing] armed with any offensive or dangerous weapon without reasonable cause to fear an assault or other injury"); Of Proceedings to Prevent the Commission of Crimes, ch. 112, § 18, Rev. Stat. Minn. 528 (1851) (restricting "go[ing] armed with a . . . pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury."); Of Proceedings for Prevention of

Crimes, ch. 169, § 16, Rev. Stat. Me. 709 (October 22, 1840) ("Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may . . . be required to find sureties for keeping the peace.").[2]

After the Civil War, additional states adopted laws similar to the Massachusetts good cause model. Texas, for example, prohibited "[a]ny person [from] carrying on or about his person" certain weapons, including pistols, but provided an affirmative defense if the defendant could show that he was "in danger of an attack on his person" that was "immediate and pressing." An Act to Regulate the Keeping and Bearing of Deadly Weapons, ch. 35, §§ 1–2, 1871 Tex. Laws 25 (discussed in *State v. Duke*, 42 Tex. 455 (1874)). Several other states and territories also adopted full open carry bans during this time. *See* An Act Defining and Punishing Certain Offenses Against the Public Peace, § 1, 1889 Ariz. Sess. Laws 16 (prohibiting any person within any settlement from "carry[ing] on or about his person, saddle, or in his saddlebags, any pistol."); An Act to Prevent the Carrying of Fire Arms and Other Deadly Weapons, ch. 52, § 1, Wyo. Comp. Laws 352 (1876) (declaring that it is unlawful for any resident of or visitor to a city or village to "bear upon his person, concealed or openly, any fire arm or other deadly weapon."); An Act Regulating the Use and

---

[2] The majority considers these types of regulations unpersuasive because of the citizen-complaint mechanism used to enforce some of these laws. *See* Maj. Op. at 33–34. But the point here is that states have long regulated public carry and specifically provided exceptions to their regulations for those with specific self-defense needs. The fact that the public carry regulations may have been triggered by citizen-complaint mechanisms does not change the states' recognition that public carry may be limited.

Carrying of Deadly Weapons in Idaho Territory, § 1, 1888 Idaho Sess. Laws 23 (declaring that it is unlawful for anyone who is not a state or federal employee on duty "to carry, exhibit or flourish any . . . pistol, gun or other deadly weapons, within the limits or confines of any city, town or village."); 1881 Kan. Sess. Laws 92, ch. 37, § 23 ("The council shall prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise.").

Numerous states adopted good cause limitations on public carry in the early 20th century. Laws from this time period may also be considered "longstanding" under *Heller*. *See Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) (noting that the Supreme Court "considered prohibitions on the possession of firearms by felons to be longstanding although states did not start to enact them until the early 20th century." (internal quotation marks omitted)). Indeed, Hawaii's law dates to this time. 1927 Haw. Laws 209, act 206, § 7; *see also* 1913 N.Y. Laws 1629 (requiring a showing of "proper cause"); *Drake*, 724 F.3d at 432 (explaining that New Jersey's "justifiable need" standard based on "special danger" for public carry licenses has existed in some form for nearly 90 years, beginning in 1924). Other states imposed other public carry restrictions. Oklahoma, for example, established strict limits on public carry. *See* Will T. Little et al., The Statutes of Oklahoma, 495–96, § 2 (1890) ("It shall be unlawful for any person in this territory of Oklahoma, to carry upon or about his person any pistol, revolver . . . or any other offensive or defensive weapon."). A more comprehensive review demonstrates that state regulation of public carry has existed throughout United States history, and that there is a long history of regulations similar to Hawaii's statute.

### B. Good Cause Regulations Are Longstanding and Presumptively Lawful

The longstanding and widespread nature of these regulations is determinative as we decide on the constitutionality of Hawaii's regulatory framework. As noted above, the Supreme Court emphasized in *Heller* that nothing in its opinion "should be taken to cast doubt" on the legitimacy of various longstanding limitations on the carry of firearms and that the list of "presumptively lawful regulatory measures" it specifically mentioned did not "purport to be exhaustive." *Heller*, 554 U.S. at 626–27 n. 26.

In *Drake*, the Third Circuit concluded that New Jersey's limitations on public carry to those with a justifiable need to carry a handgun due to "special danger to the applicant's life that cannot be avoided by [other] means" are such longstanding regulations that they join this presumptively lawful list. 724 F.3d at 428, 431–34. Hawaii's limitation on public carry to those with a fear of injury is very similar to New Jersey's regime. Based on the analysis in that decision and the history discussed above, I conclude that Hawaii's scheme should likewise be presumptively lawful under *Heller*.[3]

---

[3] The majority opinion elects to disregard these enactments because it says it does not know the level of enforcement and cannot discern whether they were enacted "with a militia or a self-defense oriented view of the right to bear arms in mind." Maj. Op. at 35 n. 13. Those explanations do not speak to the point, though. States did in fact adopt these limitations on the carry of firearms, presuming the limitations to be lawful and consistent with the Second Amendment, and they did so long ago, making the restrictions long-established regulatory measures that are presumptively lawful.

*C. Public Carry Is Not the Core of the Second Amendment*

Even if Hawaii's regulations were not presumptively lawful, it is plain from the long history of state regulation that a general right to publicly carry firearms is not part of the "core" of the Second Amendment. As the Second Circuit held in *Kachalsky*, "[t]he historical prevalence of the regulation of firearms in public demonstrates that while the Second Amendment's core concerns are strongest inside hearth and home, states have long recognized a countervailing and competing set of concerns with regard to handgun ownership and use in public. . . . Because our tradition so clearly indicates a substantial role for state regulation of the carrying of firearms in public, we conclude that intermediate scrutiny is appropriate in this case." *Kachalsky*, 701 F.3d at 96.

The majority opinion is simply incorrect when it concludes, at 32, that "the important founding-era treatises, the probative nineteenth century case law, and the post-civil war legislative scene each reveal a single American voice." As demonstrated by the discussion above, there was no single voice on this question, as there is not today.

The majority's assertion that our court has not yet concluded that the core of the Second Amendment is focused on self-defense in protection of hearth and home is also incorrect. We have repeatedly made statements to that effect. *See Jackson v. Cty. of San Francisco*, 746 F.3d 953, 963–64 (9th Cir. 2014) ("On its face, section 4512 implicates the core because it applies to law-abiding citizens, and imposes restrictions on the use of handguns within the home. . . . Having to retrieve handguns from locked containers or removing trigger locks makes it more difficult 'for citizens to use them for the core lawful purpose of self-defense' in

the home." (quoting *Heller*, 554 U.S. at 630)); *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013) ("*Heller* tells us that the core of the Second Amendment is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" (quoting *Heller*, 554 U.S. at 635)); *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) ("*Heller* identified the core of the Second Amendment as the right of law-abiding, responsible citizens to use arms in defense of hearth and home." (internal quotation marks omitted)). It is true that "[w]e have not decided the degree to which the Second Amendment protects the right to bear arms outside the home." *See Teixeira v. Cty. of Alameda*, 873 F.3d 670, 686 n. 19 (9th Cir. 2017) (en banc). But despite the majority opinion's assertion, Maj. Op. at 47 n. 19, *Teixeira* did not say that we have not mapped the "core" of the Second Amendment. The cases cited above have spoken to that subject.

Many of the other circuits have defined the core of the Second Amendment as our prior cases have. *See Drake*, 724 F.3d at 431 (stating that "the individual right to bear arms for the purpose of self-defense" in the home is "the 'core' of the right as identified by *Heller*."); *Kachalsky*, 701 F.3d at 89, 94 ("*Heller* explains that the 'core' protection of the Second Amendment is the 'right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" (quoting *Heller*, 554 U.S. at 634–35)); *United States v. Masciandaro*, 638 F.3d 458, 467 (4th Cir. 2011) ("[T]here now exists a clearly-defined fundamental right to possess firearms for self-defense within the home."); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("If Second Amendment rights apply outside the home, we believe they would be measured by the traditional test of intermediate scrutiny."); *Nat'l Rifle Ass'n of America, Inc. v. ATFE*, 700 F.3d 185, 193 (5th Cir. 2012) ("The [*Heller*]

Court invalidated the laws because they violated the central right that the Second Amendment was intended to protect— that is, the 'right of law-abiding, *responsible* citizens to use arms in defense of hearth and home.'" (quoting *Heller*, 554 U.S. at 635) (emphasis in original)). I am thus joined by most of the other circuits that have spoken to the question in defining the core of the Second Amendment as defense of hearth and home. My understanding is firmly grounded in the long history of allowing substantial state regulation of public carry.

## II. Intermediate Scrutiny

Because I conclude that Hawaii's regulatory framework does not "impose[] such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right," the most demanding level of review that can be applied to Hawaii's regulatory framework is intermediate scrutiny. *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). It appears to me that there is a reasonable fit between Hawaii's public carry regulations and its unquestionably legitimate goal of promoting public safety so that Hawaii's statute would pass constitutional muster. Given the stage of the case and the direction of the majority, it does not seem worthwhile to try to launch a complete intermediate scrutiny analysis at this point. I note, however, that the majority opinion makes some critical errors in declining to consider that analysis.

First, Hawaii does provide an alternative mode of access to publicly carry firearms for self-defense. As we stated in *Jackson*, "firearm regulations which leave open alternative channels for self-defense are less likely to place a severe burden on the Second Amendment right than those which do not." 746 F.3d at 961. Under Hawaii's law, citizens may obtain a concealed carry permit if they can show reason to

fear injury. They thus are not "entirely foreclosed" from obtaining a permit to bear arms in public for self-defense, as asserted in the majority opinion, at 52. Moreover, the majority opinion's assessment, at 52 n. 21, that "section 134-9 does not offer a realistic opportunity for a concealed carry license" lacks support in the record. No record has been developed in this case, so a conclusion that the regulation acts as a total ban is unsupported. It may be, as stated at oral argument, that no concealed carry permit has been issued by the County, but we have no information whatsoever about the applicants for concealed carry permits, let alone enough information to support a finding that those applicants would have been eligible for a permit even if Hawaii had a "shall-issue" regime. Under our precedent, the fact that Hawaii may provide an alternative channel for public carry should weigh in favor of finding that the law withstands constitutional scrutiny.[4]

---

[4] This point speaks to a broader problem with the majority's analysis. Throughout its opinion, the majority attempts to focus only on whether the Second Amendment protects a right to open carry, based on an erroneous assumption that any other analysis is foreclosed by our decision in *Peruta II*. I do not agree with this approach, and its artificiality becomes clear when we move to the intermediate scrutiny analysis. *Peruta II* specifically declined to decide not only whether the Second Amendment protects open carry, but also whether it protects "a right of a member of the general public to carry firearms in public." *Peruta II*, 824 F.3d at 927. In applying intermediate scrutiny, the majority opinion specifically states, at 49 n. 16, that it does not address whether "a concealed carry regime could provide a sufficient channel for typical, law-abiding citizens to exercise their right to bear arms for self-defense." But this is illogical. The existence of alternative access to public carry for self-defense in the form of concealed carry is unquestionably relevant in an intermediate scrutiny analysis. Nothing in *Peruta II* said otherwise. If we apply intermediate scrutiny, we must consider the statute as a whole, rather than pretending that Hawaii has instituted a complete ban on public carry, both open and concealed.

Second, the majority's decision to pick apart the various studies cited by the state ignores the Supreme Court's dictate to "accord substantial deference to the predictive judgments" of the state legislature. *Turner Broadcasting Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997) (internal quotation marks omitted). As the Second Circuit stated in *Kachalsky*, "[i]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments." *Kachalsky*, 701 F.3d at 99; *see also Drake*, 724 F.3d at 439 (noting that "conflicting empirical evidence . . . does not suggest, let alone compel, a conclusion that the 'fit' between [a state's] individualized, tailored approach and public safety is not 'reasonable.'"). The test is not whether the state has provided flawless empirical analysis that is immune to dispute to support its reasonable conclusion that the regulatory measures promote public safety. That limiting public carry of firearms may have a positive effect on public safety is hardly a illogical proposition. Many other states appear to have reached similar conclusions, and so have most other nations.

Although the majority may not like the outcomes of those studies, and may even disagree with their approaches, intermediate scrutiny does not allow us to dismiss statutes based on our own policy views or disagreements with aspects of the analyses cited. In an intermediate scrutiny analysis, Hawaii is not required to show that its regulatory scheme "is the least restrictive means of achieving its interest" in public safety, but rather need only show that the scheme "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015) (internal quotation marks omitted).

Hawaii has met its burden by citing to significant empirical evidence and by explaining the logical inferences behind its policy choices. *See IMS Health Inc. v. Ayotte*, 550 F.3d 42, 55 (1st Cir. 2008) (abrogated on other grounds by *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) (explaining that under intermediate scrutiny states are "allowed to justify speech restrictions by reference to studies and anecdotes" and "history, consensus, and simple common sense" (internal quotation marks omitted)). As other circuits have held in *Kachalsky*, *Drake*, and *Woollard*, and as a majority of the judges on our en banc panel indicated in *Peruta II*, there is a reasonable fit between good cause limitations on public carry licenses and public safety. *See Kachalsky*, 701 F.3d at 96–100; *Drake*, 724 F.3d at 439–40; *Woollard*, 712 F.3d at 878–82; *Peruta II*, 824 F.3d at 942.

Hawaii has a very low firearm death rate as compared to other states: 4.5 deaths per 100,000 total population. *See* National Center for Health Statistics, Firearm Mortality by State, https://www.cdc.gov/nchs/pressroom/sosmap/firearm_mortality/firearm.htm. There are undoubtedly many factors that lead to that result, but we should not ignore the evidence that Hawaii has been highly successful in limiting firearm deaths and promoting public safety. Hawaii has shown that there is a reasonable fit between its statutory scheme and public safety, and the state's decision is owed deference. Any conclusion otherwise disregards our proper role in an intermediate scrutiny analysis.

## III.    Conclusion

The majority opinion goes astray in several respects. Most obviously, the majority opinion has disregarded the fact that states and territories in a variety of regions have long allowed for extensive regulations of and limitations on

the public carry of firearms. Many have taken the approach that Hawaii has taken for almost a century. Such regulations are presumptively lawful under *Heller* and do not undercut the core of the Second Amendment. In addition, the majority opinion misconceives the intermediate scrutiny test, assumes without support in the record that Hawaii's statute operates as a complete ban, and substitutes its own judgment about the efficacy of less restrictive regulatory schemes. This approach is in conflict with Supreme Court precedent, our own decisions, and decisions by other circuits.

I respectfully dissent.