The Yale Law Journal - Forum: Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context (77 of 91)

Case: 12-17808, 07/24/2018, ID: 10952459, DktEntry: 128-2, Page 1 of 10

Case 1:12-cv-00336-HG-BMK   Document 58-1   Filed 07/24/18   Page 1 of 10   PageID.528

# THE YALE LAW JOURNAL

**VOLUME 125**  2015-2016

FORUM

# Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context

25 SEP 2015

Eric M. Ruben & Saul Cornell

## INTRODUCTION

During recent oral arguments in Peruta v. County of San Diego, a case being reconsidered en banc in the U.S. Court of Appeals for the Ninth Circuit, former Solicitor General Paul Clement turned to what may appear an unusual guide for interpreting the scope of the Second Amendment in the twenty-first century. His clients had been denied permits to carry concealed handguns in San Diego because they could not demonstrate a heightened need for self-defense, and Clement was trying to convince the Ninth Circuit that the Second Amendment precluded those denials. Two of the strongest sources of authority—decisions by other federal appellate courts and evidence from the period of the Second Amendment's adoption—provided scant support for his position. In fact, several courts recently upheld "good cause" policies similar to San Diego's,[1] and firearm regulations, including those prohibiting discharge in populated areas, were common in the Founding era.[2] Instead, Clement looked to antebellum state court case law, and referred the Ninth Circuit to the interpretation of the Second Amendment from an 1846 opinion by the Georgia Supreme Court, Nunn v. State.[3] The Georgia high court held that the Second Amendment protected the right "to keep and bear arms of every description" and was violated by a law prohibiting the open carrying of certain weapons.[4] Clement argued that the Ninth Circuit should adopt Nunn's view of the Second Amendment to strike down San Diego's "good cause" policy.[5]

Nunn, of course, is not binding precedent in the Ninth Circuit. But ever since the Supreme Court's landmark decision in District of Columbia v. Heller used an originalist approach to establish the individual right to keep and bear arms,[6] courts have incorporated historical evidence into their Second Amendment jurisprudence.[7] This historical evidence includes Nunn and other antebellum state court opinions.[8] As Justice Scalia put it in his majority opinion in Heller, "interpret[ations] of the Second Amendment in the century after its enactment," including in state court opinions, are "a critical tool of constitutional interpretation," since they can point to "the scope [constitutional rights] were understood to

9

1. See Drake v. Filko, 724 F.3d 426, 434 (3d Cir. 2013); Woollard v. Gallagher, 712 F.3d 865, 881 (4t…
2. Among other things, laws restricted the way gunpowder could be stored, and several cities—includ…
3. See Oral Argument at 11:50, Peruta v. Cty. of San Diego, No. 10-56971 (June 16, 2015), http://www.…
4. Nunn, 1 Ga. at 251 (emphasis omitted). In particular, Nunn held that Georgia was precluded from pr…
5. See CAL. PENAL CODE §§ 26150(a)(2), 26155(a)(2) (2012) (requiring concealed carry applicants to …
6. 554 U.S. 570 (2008).
7. See, e.g., Peterson v. Martinez, 707 F.3d 1197, 1211 (10th Cir. 2013) (holding that to determine w…

The Yale Law Journal - Forum: Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context (78 of 91)

Case: 12-17808, 07/24/2018, ID: 10952459, DktEntry: 128-2, Page 2 of 10

Case 1:12-cv-00336-HG-BMK   Document 58-1   Filed 07/24/18   Page 2 of 10   PageID.529

have when the people adopted them."[8] Indeed, as Clement noted, the Heller majority itself favorably cited Nunn's interpretation of the Second Amendment.[10]

But when courts invoke Nunn and other antebellum opinions about the right to carry guns in public, they glance over a striking fact about the case law: it is drawn almost exclusively from the slaveholding South. This regional link raises two related questions. First, why did this case law arise in the antebellum South, but not in other areas of the country? And second, did this regional jurisprudence really reflect a national understanding of the Second Amendment's scope? If Nunn and similar cases were the product of a unique regional culture during a unique period in the nation's development, quite removed from the Founding era (and the Reconstruction era),[11] they do not provide a solid foundation for a contemporary interpretation of the Second Amendment.[12]

This Essay begins to address these questions.[13] First, it draws on the broad body of historical research into the distinctive culture of slavery and honor in the antebellum South that contributed to both arms carrying and violence.[14] This culture also influenced jurisprudence throughout the region, including the opinions of Chief Justice Joseph Henry Lumpkin, the author of Nunn. Second, we contrast Nunn's view of the right to bear arms outside the home with a separate historical tradition, dominant outside the South, which was less enthusiastic about public carry and more tolerant of broad regulation of the public bearing of arms.[15] In fact, the vast majority of Americans lived under this alternative tradition, rather than under the Nunn regime. This analysis suggests that Nunn and similar cases did not represent a national consensus about the meaning of the right to bear arms, and should not be relied upon to strike down public carry regulations today.

I. THE ANTEBELLUM SOUTH AND THE ORIGINS OF PERMISSIVE CARRY JURISPRUDENCE

Last year, when a split panel in Peruta declared San Diego's concealed carry policy unconstitutional—prompting the Ninth Circuit to rehear the case en banc—the majority rested its conclusion on an analysis of nineteenth-century cases, including Nunn, from courts in nine states, all but one of them Southern: Alabama, Arkansas, Georgia, Indiana, Kentucky, Louisiana, North Carolina, Tennessee, and Texas.[16] After reviewing these cases, the opinion for the divided court concluded that "the majority of nineteenth century courts agreed that the Second Amendment right extended outside the home and included, at minimum, the right to carry an operable weapon in public for the purpose of lawful self-defense."[17]

But the majority's presumption that this regional selection of case law reflected a national jurisprudential consensus in the nineteenth century is deeply problematic. The selective use of Southern case law in Peruta represents just the type of analysis that Justice Scalia has warned against, in which courts "look over the heads of the crowd and pick out [their] friends."[18] Understanding this jurisprudence, to borrow again from Justice Scalia, "requires immersing oneself in the political and intellectual atmosphere of the time . . . and putting on beliefs, attitudes, philosophies, prejudices and loyalties that are not those of our day."[19] These cases did not emerge in a vacuum and do not reflect the full range of American legal history. Rather, they come from a time, place, and culture where slavery, honor, violence, and the public carrying of weapons were intertwined.[20]

Violence was a central element of slave and honor culture in the South. Richard Hildreth, an antebellum lawyer, journalist, and historian, wrote in 1840 that violence was frequently employed both to subordinate slaves and to intimidate abolitionists.[21] That violence, in turn, resulted in "a complete paroxysm [sic] of fear" and "extreme degree of terror . . . of

---

| | |
|---|---|
| 8 | See, e.g., Peruta v. Cty. of San Diego, 742 F.3d 1144, 1155-60 (9th Cir. 2014), reh'g en banc g… |
| 9 | Heller, 554 U.S. at 605, 634-35. |
| 10 | See Heller, 554 U.S. at 612 (quoting Nunn, 1 Ga. at 251); Oral Argument, supra note 3, at 11:50. T… |
| 11 | Some scholars, most prominently Akhil Reed Amar, argue that the understanding of the Second Amendm… |
| 12 | Cf. McDonald v. City of Chicago, 561 U.S. 742, 871 (2010) (Stevens, J., dissenting) ("Liberty cl… |
| 13 | We take no position in this Essay regarding whether courts should use originalism as the sole mean… |
| 14 | For two notable studies relating to honor culture, slavery, and violence in the antebellum South, … |
| 15 | In the era of Reconstruction, moreover, this alternative model grew stronger and included large se… |
| 16 | In particular, the Peruta majority relied upon State v. Reid, 1 Ala. 612, 616–17 (1840); Wilson v.… |
| 17 | Peruta, 742 F.3d at 1160. |
| 18 | ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 36 (1997) (paraphrasing Jud… |
| 19 | Antonin Scalia, Originalism: The Lesser Evil, 57 U. CIN. L. REV. 849, 856-57 (1989). |

cited in Young v. State of Hawaii, No. 12-17808 archived on July 20, 2018

The Yale Law Journal - Forum: Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context (79 of 91)

Case: 12-17808, 07/24/2018, ID: 10952459, DktEntry: 128-2, Page 3 of 10

Case 1:12-cv-00336-HG-BMK Document 58-1 Filed 07/24/18 Page 3 of 10 PageID.530

slave vengeance" amongst the slaveholding class. Meanwhile, violence between white men "to preserve white manhood and personal status" was encouraged in Southern honor culture.[23] According to Hildreth, duels "appear but once an age" in the North, but "are of frequent and almost daily occurrence at the [S]outh."[24] As a result of the distinct cultural phenomena of slavery and honor, Southern men carried weapons both "as a protection against the slaves" and also to be prepared for "quarrels between freemen."[25]

Hildreth was not the only contemporary commentator to observe the prevalence of public carry in Southern society or to compare it with the norm in other parts of the country. In 1845, one year before Nunn, New York jurist William Jay contrasted "those portions of our country where it is supposed essential to personal safety to go armed with pistols and bowie-knives" with the "north and east, where we are unprovided with such facilities for taking life."[26] Frederick Law Olmstead, writing in 1857, observed that "among young men a bowie-knife was a universal, and a pistol a not at all unusual, companion in Kentucky."[27] Similarly, an 1874 New York Times editorial commented that "[i]n most of the Southern States, the keeping and bearing of arms is considered an indispensable adjunct to the freedom of an American citizen."[28] The editorial continued: "When a mob assembles in a Southern State, it is certain to be an 'armed mob.' The gun stores are among the largest and most prosperous establishments in small Southern towns."[29] In 1880, journalist H.V. Redfield published one of the earliest studies exploring Southern violence and concluded that the South's murder rate was connected to the prevalence of public carrying of weapons, particularly concealable ones.[30] In much of the South, "[s]o fixedly has this deadly custom been engrafted upon society . . . that a very earnest and prolonged effort will be required to efface it."[31] He noted that in New England, however, carrying concealed weapons was uncommon because "[t]he laws forbid it, and public sentiment condemns it so strongly that were the laws silent the habit could not be engrafted upon society."[32]

Public carry thus was popular in Southern society, but cultural norms were not silent regarding what manner of carrying was honorable. In particular, concealed carry was perceived to give men "secret advantages" and lead to "unmanly assassinations," while open carry "place[d] men upon an equality" and "incite[d] men to a manly and noble defence of themselves."[33] Some Southern legislatures, accordingly, passed laws penalizing concealed carry, while permitting open carry. Kentucky and Louisiana passed the first such laws in 1813, and other states followed suit.[34]

The challenges to these laws gave rise to the Nunn family of case law. Following the norms of the time, Southern judges wrote opinions supporting open carry as constitutionally protected, while criticizing concealed carry and noting that it was constitutionally unprotected.[35] No similar judicial record exists in the North, meanwhile, where public carry was much less prevalent and public carry restrictions appear to have gone unchallenged.[36]

The judges deciding the Southern right-to-carry cases were thus immersed in a social and legal atmosphere unique to the South.[37] The distinctive nature of Southern society, including its embrace of slavery and honor, contributed to an aggressive gun culture.[38] That culture, in turn, influenced jurists such as Chief Justice Lumpkin, who had considerable success "translating his personal views into law."[39] At minimum, the historical origins of Nunn and similar cases ought to give modern judges serious pause as they consider public carry cases, like Peruta, in the post-Heller era.

II. AN ALTERNATIVE REGULATORY TRADITION

---

20 See Robert J. Cottrol & Raymond T. Diamond, "Never Intended to Be Applied to the White Populatio…

21 Richard Hildreth, Despotism in America: An Inquiry into the Nature, Results, and Legal Basis of th…

22 Id. at 89-90.

23 See Wyatt-Brown, supra note 14, at 368-69.

24 See Hildreth, supra note 21, at 145.

25 Id. at 90; see also Roth, supra note 14, at 218 ("Few whites had carried pistols or fighting kni…

26 William Jay, Address Before the American Peace Society at Its Annual Meeting 23-24 (1845).

27 Frederick Law Olmstead, A Journey Through Texas, or, A Saddle-trip on the Southwestern Frontier 20…

28 Editorial, A Question for Arkansas, N.Y. Times, May 11, 1874, at 4.

29 Id.

30 H.V. Redfield, Homicide, North and South: Being a Comparative View of Crime Against the Person in …

31 Redfield, supra note 30, at 195.

32 Id. at 194.

33 See State v. Chandler, 5 La. Ann. 489, 490 (1850) (stating that open carry "is calculated to inc…

34 See Act of Feb. 3, 1813, ch. 89, 1812 Ky. Acts 100; Act of Mar. 25, 1813, 1812 La. Acts 172; Act o…

35 See, e.g., Chandler, 5 La. Ann. at 489-90. Nunn based its holding on the Second Amendment, while o…

36 See infra Part II. We do not intend to suggest that violence or firearms

Case: 12-17808, 07/24/2018, ID: 10952459, DktEntry: 128-2, Page 3 of 10 (79 of 91)

The Yale Law Journal - Forum: Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context (80 of 91)

Case: 12-17808, 07/24/2018, ID: 10952459, DktEntry: 128-2, Page 4 of 10

Case 1:12-cv-00336-HG-BMK Document 58-1 Filed 07/24/18 Page 4 of 10 PageID.531

Nunn's permissive view of public carry was not universally held in the United States— indeed, it was not universally held in the South.[40] Another prevalent view accepted robust regulation of the right to carry. The roots of this alternative framework can be traced to the regulatory regime of medieval England. In 1328, the English Statute of Northampton began a tradition of prohibiting armed travel through fairs, markets, and other populated areas.[41] Others have explored the evolution of this prohibition in England.[42] What is important for this Essay is that several early American states expressly incorporated versions of the Statute of Northampton into their laws.[43] In those states, constables, magistrates, or justices of the peace had the authority to arrest anyone who traveled armed contrary to prohibitions derived from the Statute of Northampton. As a North Carolina jurist, James Davis, put it in 1774:

> Justices of the Peace, upon their own View, or upon Complaint, may apprehend any Person who shall go or ride armed with unusual and offensive weapons, in an Affray, or among any great Concourse of the People, or who shall appear, so armed, before the King's Justices sitting in Court.[44]

These types of restrictions on the right to bear arms were widely considered permissible at the Founding.[45]

Modern proponents of an expansive right to public carry downplay this early regulation, insisting, for example, that it only covered "arms carrying with the specific intent of terrorizing the public."[46] This reading is partially due to the fact that some early American versions of the Statute of Northampton, exemplified by a 1790s Massachusetts law, gave justices of the peace the authority to arrest "such as shall ride or go armed offensively, to the fear or terror of the good citizens."[47] But as William Blackstone suggested in his Commentaries on the Laws of England, terrorizing the public was the consequence of going armed.[48] Blackstone wrote that "by the laws of Solon, every Athenian was finable who walked about the city in armour," and similarly, in England "riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land."[49] In other words, the act of traveling armed in a populated place was sufficient under common law to constitute the offense. Accordingly, an 1805 treatise written for justices of the peace in New Jersey made clear that peace officers could, on their own initiative, apply this restriction to a man traveling armed "though he may not have threatened any person in particular, or committed any particular act of violence."[50] Similarly, other early American versions of the Statute of Northampton omitted any mention of "terror." North Carolina's statute, for example, stated that "no man great nor small [shall] go nor ride armed by night nor day, in fairs, markets, nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere."[51] By its plain terms the North Carolina prohibition applied categorically, regardless of any "intent to terrorize."

In 1836, Massachusetts revised its public carry restriction, omitting any reference to "fear or terror" and adding a new exception for public carry in the limited circumstances where a person had a "reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property."[52] Under the statute, any person publicly carrying a weapon could be arrested upon the complaint of any other person "having reasonable cause to fear an injury, or breach of the peace."[53] Defendants were permitted the opportunity to provide a defense, such as proving that they reasonably had armed themselves in response to a threat. If, after a hearing, the justice of the peace determined that the defendant violated the statute, the defendant would be required to provide "sureties for his keeping the Peace,"[54] a common enforcement tool in early America. At common law, sureties were similar to present-day guarantors in the bail context: members of the community who would pledge

---

| | |
|---|---|
| | carrying did not exist in… |
| 37 | Some gun rights advocates have acknowledged as much. See, e.g., Cottrol & Diamond, supra note 20, … |
| 38 | See supra notes 20-33 and accompanying text. |
| 39 | Mason W. Stephenson & D. Grier Stephenson, Jr., "To Protect and Defend": Joseph Henry Lumpkin,… |
| 40 | See, e.g., infra note 44 and accompanying text (discussing the ability of justices of the peace to… |
| 41 | 2 Edw. 3, c. 3 (1328), reprinted in 1 THE STATUTES OF THE REALM 258 (mandating that individuals … |
| 42 | For a helpful exposition of how the Statute of Northampton evolved through the centuries, see Patr… |
| 43 | See 1852 Del. Laws 330-33; 1795 Mass. Acts 436; 1821 Me. Laws 285; 1792 N.C. Sess. Laws 60-61; 180… |
| 44 | See J. DAVIS, THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE 13 (Newbern, James Davis 1774) (c… |
| 45 | See Charles, supra note 42, at 31-36 (describing the express adoption of similar prohibitions in m… |
| 46 | David B. Kopel & Clayton Cramer, State Standards of Review for the Right to Keep and Bear Arms, 50… |
| 47 | 1795 Mass. Acts 436 (emphasis added). For a contemporary analysis of the statute, see 1 WILLIAM CH… |
| 48 | See 4 WILLIAM BLACKSTONE, COMMENTARIES *148-49. |
| 49 | Id. (emphasis added). |
| 50 | JAMES EWING, A TREATISE ON THE OFFICE AND DUTY OF A JUSTICE OF THE PEACE, SHERIFF, CORONER, CONSTA… |
| 51 | FRANCOIS-XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STAT… |

*cited in Young v. State of Hawaii No. 12-17808 and filed on July 20, 2018*

The Yale Law Journal - Forum: Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context (81 of 91)

Case: 12-17808, 07/24/2018, ID: 10952459, DktEntry: 128-2, Page 5 of 10
Case 1:12-cv-00336-HG-BMK   Document 58-1   Filed 07/24/18   Page 5 of 10   PageID.532

responsibility for the defendant and risk losing their bond if the defendant failed to "keep the peace."[55] In a rural society before the age of police forces or an administrative state, this citizen-complaint process was an efficient way to deal with the danger posed by public carrying, especially where that danger was limited because public carry was not "engrafted" on the regional culture.[56]

The same year Massachusetts revised its law, the respected jurist Peter Oxenbridge Thacher, whose judicial decisions and other writings "had made him known throughout the country,"[57] issued a grand jury charge explaining the restrictions on public carry in Massachusetts. He instructed that in the Commonwealth, "no person may go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to apprehend an assault or violence to his person, family, or property."[58] Judge Thacher's charge was praised in the contemporary press as "sensible," "practical," and "sage."[59] It lies of course in stark contrast to Chief Justice Lumpkin's later pronouncements on the unconstitutionality of open carry regulations.[60]

Massachusetts was not alone in its broad regulation of public carry. Over the next several decades, Wisconsin, Maine, Michigan, Virginia, Minnesota, Oregon, and Pennsylvania passed laws modeled on the 1836 Massachusetts statute.[61] While modern regulatory schemes, such as the "good cause" permitting policy at issue in Peruta, do not operate in exactly the same manner as these regulations passed primarily outside the South in the nineteenth century, they are a logical analogue given present-day circumstances. Significantly, both regimes presume that the state's police power justifies limiting the right to carry arms in public to circumstances in which there is a clear justification, such as a heightened need for self-defense.[62]

After the Civil War, the Massachusetts model—generally restricting public carry with limited exceptions for people with reasonable cause to fear attack—gained traction in parts of the South. One of the fullest judicial expositions of the scope of this regulatory model occurred after Texas enacted a statute that reflected the Massachusetts one, titled, "Act to regulate the keeping and bearing of deadly weapons."[63] The Texas law prohibited "[a]ny person [from] carrying on or about his person" pistols, knives, and other specified weapons.[64] The Act provided an affirmative defense if a defendant could show that he or she faced an "immediate and pressing" danger that would "alarm a person of ordinary courage."[65] In State v. Duke, the Texas Supreme Court upheld this statute as "a legitimate and highly proper regulation" that "appears to have respected the right to carry a pistol openly when needed for self-defense or in the public service, and the right to have one at the home or place of business."[66]

Meanwhile, outside both the South and North, frontier towns adopted public carry regulations by the era of the Fourteenth Amendment that were far stricter than even those in Massachusetts and Texas.[67] Desiring to reduce violence and attract businessmen who might not invest in places where they felt endangered, many frontier towns prohibited public carry altogether.[68] Even famed "wild west" places like Tombstone and Dodge City banned carrying firearms within town limits.[69]

Thus, it appears that much of the country did not share Nunn's view that broad regulation of public carry ran afoul of the right to bear arms. Most regions, and parts of the South itself, were amenable to substantial restrictions on public carry rights in the interest of public safety, restrictions that were reflected in statutes, the press, grand jury charges, and Reconstruction-era opinions such as Duke.

---

| | |
|---|---|
| 52 | 1836 Mass. Acts 750 ("If any person shall go armed with a dirk, dagger, sword, pistol, or other … |
| 53 | 1795 Mass. Acts 436, ch. 2; see also Arrest Warrant of Benjamin Bullock (August 13, 1853) (on file… |
| 54 | See 1795 Mass. Acts 436, ch. 2. |
| 55 | See 5 William Blackstone, Commentaries *251-53 (discussing the common law practice of providing su… |
| 56 | See supra notes 30-32 and accompanying text. |
| 57 | 3 The American Review: A Whig Journal of Politics, Literature, Art and Science 222, 223 (1846) (re… |
| 58 | Peter Oxenbridge Thacher, Two Charges to the Grand Jury of the County of Suffolk, for the Commonwe… |
| 59 | See Judge Thacher's Charges, Christian Reg. & Bos. Observer, June 10, 1837, at 91. |
| 60 | See supra notes 3-4 and accompanying text. |
| 61 | See An Act to Prevent the Commission of Crimes, § 16, reprinted in Statutes of the Territory of Wi… |
| 62 | Research into public carry restrictions contrary to the Nunn regime only recently received attenti… |
| 63 | Law of April 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25, reprinted in 6 H. Gammel, Laws Of Texa… |
| 64 | Law of April 12, 1871, in Gammel, supra note 63, at 927. |
| 65 | Id. |
| 66 | State v. Duke, 42 Tex. 455, 459 |

The Yale Law Journal - Forum: Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context (82 of 91)

Case: 12-17808, 07/24/2018, ID: 10952459, DktEntry: 128-2, Page 6 of 10

Case 1:12-cv-00336-HG-BMK   Document 58-1   Filed 07/24/18   Page 6 of 10   PageID.533

## CONCLUSION

In recent years, courts have been asked to strike down public carry restrictions on the basis of the original understanding of the Second Amendment. If the judges deciding those cases choose to look to history, they should keep in mind that diverse regional understandings of the right to carry firearms have persisted throughout our nation's history. While Nunn represents one perspective on the constitutionality of public carry restrictions, it falls woefully short of reflecting a national consensus. Indeed, the value of cases like Nunn is greatly diminished by the fact that a great many Americans in the antebellum years lived outside the South, in places less enthusiastic about public carry and more accepting of public carry restrictions. Rather than relying on regional case law derived from the antebellum South, whose gun culture and jurisprudence were influenced by the culture of slavery and honor, judges seeking historical guidance in public carry cases today can and should seek guidance from the alternative tradition that presumed the constitutional soundness of broad public carry restrictions. At a minimum, persuasive historical precedent exists for a view of the Second Amendment that accommodates modern "good cause" permitting schemes requiring applicants to show a heightened need for self-defense in order to carry handguns in public.

Eric M. Ruben is a Jurisprudence Fellow at the Brennan Center for Justice at New York University School of Law. Saul Cornell is the Paul and Diane Guenther Chair in American History at Fordham University. The authors would like to thank Joseph Blocher for helpful comments on an early draft, and Graham White, Joseph Masterman, and other members of the Yale Law Journal for outstanding editorial assistance.

Preferred Citation: Eric M. Ruben & Saul Cornell, Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Y<small>ALE</small> L.J. F. 121 (2015), http://www.yalelawjournal.org/forum/firearm-regionalism-and-public-carry.

| | |
|---|---|
| | (1874). The Peruta majority rejected Duke because the Texas consti… |
| 67 | See Blocher, supra note 11, at 117-18 (describing severe firearms restrictions in Western towns wi… |
| 68 | A<small>DAM</small> W<small>INKLER</small>, G<small>UN</small> F<small>IGHT</small> 171-73 (2011). |
| 69 | See R<small>OBERT</small> R. D<small>YKSTRA</small>, T<small>HE</small> C<small>ATTLE</small> T<small>OWNS</small> (1983); W<small>INKLER</small>, supra note 68, at 13, 163-65 (summarizing… |

cited in Young v. State of Hawaii, No. 12-17808 archived on July 20, 2018

| MENU | CDC A-Z | SEARCH |
|---|---|---|

[CDC](#)  >  [NCHS Home](#)  >  [NCHS Pressroom](#)

# Firearm Mortality by State

| **2016** | 2015 | 2014 | 2005 |



WAMTIDNDMNMEMIWIORSDNYWYIANEMAILPACAUTNVOHINCOWVMOKSVAKY
AZOKNMTNNCTXARSCALGAMSLAFLHIAKCTDEMDNHNJRIVT

*cited in Young v. State of Hawaii, No. 12-17808 archived on July 20, 2018*

### Age-Adjusted Death Rates[1]

United States 11.8

- 3.4 - 9
- 9.1 - 11.9
- 12 - 13.7
- 14.3 - 17.5
- 17.7 - 23.3

### Data Table ➕ ➖

| Location | Firearm Death Rate (Click for Rankings) | Deaths (Click for Rankings) |
|---|---|---|
| Alabama | 21.5 | 1,046 |
| Alaska | 23.3 | 177 |
| Arizona | 15.2 | 1,094 |

| State | Rate | Deaths |
|---|---|---|
| Arkansas | 17.8 | 541 |
| California | 7.9 | 3,184 |
| Colorado | 14.3 | 812 |
| Connecticut | 4.6 | 172 |
| Delaware | 11.0 | 111 |
| Florida | 12.6 | 2,704 |
| Georgia | 15.0 | 1,571 |
| Hawaii | 4.5 | 66 |
| Idaho | 14.6 | 242 |
| Illinois | 11.7 | 1,490 |
| Indiana | 15.0 | 997 |
| Iowa | 9.2 | 288 |
| Kansas | 13.4 | 383 |
| Kentucky | 17.5 | 772 |
| Louisiana | 21.3 | 987 |
| Maine | 8.3 | 123 |
| Maryland | 11.9 | 707 |
| Massachusetts | 3.4 | 242 |
| Michigan | 12.3 | 1,230 |
| Minnesota | 7.6 | 432 |
| Mississippi | 19.9 | 587 |
| Missouri | 19.0 | 1,144 |
| Montana | 18.9 | 194 |
| Nebraska | 9.1 | 171 |
| Nevada | 16.8 | 498 |
| New Hampshire | 9.3 | 132 |
| New Jersey | 5.5 | 485 |
| New Mexico | 18.1 | 383 |
| New York | 4.4 | 900 |
| North Carolina | 13.7 | 1,409 |
| North Dakota | 11.9 | 90 |
| Ohio | 12.9 | 1,524 |
| Oklahoma | 19.6 | 766 |

cited in Young v. State of Hawaii, No. 12-17808 archived on July 20, 2018

| State | Rate | Deaths |
|---|---|---|
| Oregon | 11.9 | 513 |
| Pennsylvania | 12.0 | 1,555 |
| Rhode Island | 4.1 | 49 |
| South Carolina | 17.7 | 891 |
| South Dakota | 13.4 | 108 |
| Tennessee | 17.1 | 1,148 |
| Texas | 12.1 | 3,353 |
| Utah | 12.9 | 370 |
| Vermont | 11.1 | 78 |
| Virginia | 12.1 | 1,049 |
| Washington | 9.0 | 686 |
| West Virginia | 17.5 | 332 |
| Wisconsin | 11.4 | 664 |
| Wyoming | 17.4 | 101 |

[1]The number of deaths per 100,000 total population.

Source: https://wonder.cdc.gov

States are categorized from highest rate to lowest rate. Although adjusted for differences in age-distribution and population size, rankings by state do not take into account other state specific population characteristics that may affect the level of mortality. When the number of deaths is small, rankings by state may be unreliable due to instability in death rates.

*Young v. State of Hawaii, No. 12-17808 archived on July 20, 2018 cited.gov*

Health Statistics Blog

CDC Online Newsroom

FastStats

NCHS Publications and Products

Page last reviewed:  January 10, 2018

Page last updated:  January 10, 2018

Content source:  CDC/National Center for Health Statistics



**ABOUT**

About CDC    Jobs    Funding

**LEGAL**

Policies    Privacy    FOIA    No Fear Act    OIG

1600 Clifton Road Atlanta, GA 30329-4027 USA

800-CDC-INFO (800-232-4636), TTY: 888-232-6348

Email CDC-INFO

U.S. Department of Health & Human Services

HHS/Open

USA.gov

cited in Young v. State of Hawaii, No. 12-17808 archived on July 20, 2018